1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

E.W. a minor by and through her parent K.W.,

Plaintiffs,

vs.

Peninsula School District,

Defendant.

Case No.:

COMPLAINT AND PETITION FOR
JUDICIAL REVIEW AND FOR RECOVERY
OF ATTORNEY FEES AND COSTS

Plaintiff brings this action to appeal the Findings of Fact, Conclusions of Law, and Final Order ("Final Order") entered by Administrative Law Judge Jill H. Brown on July 2, 2024. This appeal is made pursuant to 20 U.S.C. § 1415(i)(2) and Wash. Admin. Code § 392-172A-05115.

## I.    PARTIES

2.1    K.W. ("Parent") resides with E.W. ("Student") and have resided at all times relevant to this action within the Peninsula School District's boundary lines in Gig Harbor, Washington, located in Pierce County, Washington.  To protect the privacy of the minor child

COMPLAINT AND PETITION FOR JUDICIAL REVIEW AND FOR RECOVERY OF ATTORNEY FEES AND COSTS-
PAGE 1 OF 7

**Cedar Law PLLC**
113 Cherry St., PMB 96563
Seattle, WA 98104-2205
206.607.8277 (tel)
206.237.9101 (fax)

at issue, only Plaintiffs' initials are used. The true identities of Plaintiffs are known to the parties.

2.2     Peninsula School District (herein after "Defendant" or "the District") is a school district organized under the laws of the State of Washington and is located at 14015 62nd Ave NW, Gig Harbor, WA 98332.

## II.    JURISDICTION AND VENUE

3.1     Plaintiffs' claims appeal the Final Order arise under the Individuals with Disabilities Education Act ("IDEA") 20 U.S.C. §1400 et. seq.; 28 U.S.C. §§ 2201 and 2202; and the state Education for All Act ("State Act") Chapter 28A.13 RCW; and the regulations promulgated thereunder.

3.2     Plaintiffs' claims for attorney's fees arise under the IDEA, 20 U.S.C. § 1415(i)(3)(B).

3.3     This Court has jurisdiction pursuant to 20 U.S.C. § 1415 et al., 20 U.S.C. § 1415(i)(3)(A) and 20 U.S.C. § 1415(i)(2) and 28 U.S.C. § 1391(b), 28 U.S.C. §§ 1331 and 1342.

3.4     All acts and omissions at issue occurred in the Western District of Washington. Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b).

## III.    FACTUAL ALLEGATIONS

4.1     Student is a student with a disability under IDEA, 20 U.S.C. § 1401(3) and regulations promulgated pursuant to it at 34 C.F.R. 300 et seq as well as Washington's implementing regulations.  At all times relevant to this action, Student was eligible for special education and related services under IDEA.

**Cedar Law PLLC**
113 Cherry St., PMB 96563
Seattle, WA 98104-2205
206.607.8277 (tel)
206.237.9101 (fax)

4.2     Plaintiffs initiated an administrative due process hearing regarding the provision of special education services to E.W., which was assigned Office of the Superintendent of Public Instruction Cause No. 2023-SE-0130 and Office of Administrative Hearings Docket No. 07-2023-OSPI-01971. An administrative hearing was held before Administrative Law Judge Jill Brown on March 11-15, March 25, and April 5, 2024. The primary issues in the hearing were whether the District violated the IDEA by failing to provide E.W. a free appropriate public education ("FAPE") and an appropriate reevaluation under the IDEA and whether Plaintiffs were entitled to their requested relief.

4.3     The issues before the ALJ touch on the 2021-2022, 2022-2023, and 2023-2024 school years and the District's alleged failures to provide FAPE and conduct an appropriate reevaluation for Student's eligibility for special education services and the properness of Student's private placement as well as Student's entitlement to compensatory education and other relief related to Student's more recent placement at a Deaf and Hard of Hearing school.

4.4     On Thursday, July 2, 2024, ALJ Brown issued the Final Order, a copy of which is appended hereto. Among ALJ Brown's numerous errors, including errors by omission, the Final Order included factual findings that are not supported by the administrative record and legal conclusions that are not supported that ALJ Brown wrongfully determined and misapplied in her legal analysis.

4.5     Student attended elementary and middle school in the District through the end of the 2021-2022 school year. Student attended St. Nicholas's Catholic School for the 2022-2023 school year, which is located in Washington.

**Cedar Law PLLC**
113 Cherry St., PMB 96563
Seattle, WA 98104-2205
206.607.8277 (tel)
206.237.9101 (fax)

4.6     The District was provided with written notice of Parent's intent to unilaterally place Student at St. Nicholas due to Parent's belief that the District was denying Student a FAPE and the District issued a prior written notice in response thereto.

4.7     Student returned to the District for the first couple of months of the 2023-2024 school year. On November 16, 2023, Student started at Baker Middle School's Deaf and Hard of Hearing program in the Tacoma School District.

4.8     The IDEA provides an appeal of the ALJ Decision as a matter of right. Specifically, 20 U.S.C. § 1415(i)(2)(A) states:

> Any party aggrieved by the findings and decision made under subsection (f) or (k) who does not have the right to an appeal under subsection (g), and any party aggrieved by the findings and decision made under this subsection, shall have the right to bring a civil action with respect to the complaint presented pursuant to this section, which action may be brought in any State court of competent jurisdiction or in a district court of the United States, without regard to the amount in controversy.

4.9     This right to appeal also is set forth in the Washington Administrative Code at Wash. Admin. Code § 392-172A-05115(1), which states:

> Any party aggrieved by the findings and decision made under WAC 392-172A-05105 through 392-172A-05110 or 392-172A-05165 has the right to bring a civil action with respect to the due process hearing request. The action may be brought in any state court of competent jurisdiction or in a district court of the United States without regard to the amount in controversy.

4.10    The Plaintiffs brings this appeal pursuant to the above-stated provisions.

4.11    If Plaintiffs' appeal is successful, Plaintiffs will be entitled to attorney's fees and costs for the matter that gives rise to this appeal as well as the appeal.  Accordingly, pursuant to 20 U.S.C. § 1415(i)(3)(B), Plaintiffs request the Defendant be ordered to reimburse Plaintiffs

**Cedar Law PLLC**
113 Cherry St., PMB 96563
Seattle, WA 98104-2205
206.607.8277 (tel)
206.237.9101 (fax)

for all attorneys' fees and costs accrued to date and in the future as it relates to the underlying

action that gives rise to this appeal, the appeal, and any matters related to this appeal.

## V.    CAUSES OF ACTION

### A.  Appeal of Administrative Order Under IDEA.

5.1     The factual allegations set forth in the above paragraphs are and incorporated by reference.

5.2     Pursuant to the IDEA and Washington State's special education laws, the Defendant denied E.W. a FAPE and committed multiple violations of IDEA that resulted in a denial of FAPE to E.W. during the 2021-2022, 2022-2023, and 2023-2024 school years. Moreover, the District's reevaluation of Student was not appropriate.

5.3     ALJ Brown's Final Order found that the District did not deny Student a FAPE and did not violate the IDEA during the time period at issue.  ALJ Brown made several factual findings that are unsupported by the record. ALJ Brown erroneously concluded that the District's November 2021 Reevaluation was appropriate. ALJ Brown erred in concluding that Student's IEP and its implementation were appropriate and reasonably calculated to deliver a FAPE to Student.

5.4     The Plaintiff is aggrieved by ALJ Brown's Final Order and is entitled to appeal that decision.

5.5     If Parent prevails on any of the issues raised in the underlying case addressed herein, Parent is entitled to reasonable attorney fees and costs as the prevailing party.

### B.  Request for Reasonable Attorney Fees and Costs Under the IDEA.

**Cedar Law PLLC**
113 Cherry St., PMB 96563
Seattle, WA 98104-2205
206.607.8277 (tel)
206.237.9101 (fax)

5.6     The factual allegations set forth in the above paragraphs are and incorporated by reference.

5.7     If Plaintiffs prevail on their appeal, they are entitled to attorneys' fees and costs for the underlying action that gives rise to this appeal, the appeal, and all other related matters.

5.8     Plaintiffs are entitled to reasonable attorney fees and costs related to this action.

## VI.    REQUEST FOR RELIEF

Plaintiffs requests that the Court enter an order:

6.1     Reversing the erroneous findings and conclusions in ALJ Brown's Final order.

6.2     Declaratory ruling that Parent is the prevailing party in the underlying action and their appeal.

6.3     Enter a declaratory judgement that the Defendant denied E.W. a free appropriate public education under the IDEA and state law.

6.4     Grant Plaintiff's request for compensatory education and for tuition, related costs, and other services paid for by Plaintiffs.

6.5     Grant Plaintiff's requests for reimbursement for the IEE conducted by Dr. Wilson as well as other related costs.

6.6     Grant Plaintiff's requests for other specific relief requested in the underlying complaint and amended complaint and issues, including that the District provide Student with a FAPE and all that it entails.

6.7     Award Plaintiffs with their costs and reasonable attorney fees as the prevailing party in the due process hearing and any additional fees incurred in this action to enforce their rights to a fee award pursuant to 20 USC § 1415(i)(3)(B).

**Cedar Law PLLC**
113 Cherry St., PMB 96563
Seattle, WA 98104-2205
206.607.8277 (tel)
206.237.9101 (fax)

6.8     Plaintiffs pray for such other equitable or legal relief as the Court deems just.

DATED this 26th day of September, 2024.

CEDAR LAW PLLC

By: _____
        Ryan P. Ford, WSBA No. 50628
        Attorney for Plaintiff
        113 Cherry St., PMB 96563
        Seattle, WA 98104
        Tel (206) 607-8277
        Fax (206) 237-9101
        ryan@cedarlawpllc.com

**WASHINGTON STATE**
**OFFICE OF ADMINISTRATIVE HEARINGS**

| | |
|---|---|
| In the matter of: | Docket No.   07-2023-OSPI-01971 |
| | **FINDINGS OF FACT, CONCLUSIONS OF LAW, AND FINAL ORDER** |
| Peninsula School District | Agency:   Office of Superintendent of Public Instruction |
| | Program:   Special Education |
| | Cause No.   2023-SE-0130 |

A due process hearing was held before Administrative Law Judge (ALJ) Jill H. Brown on March 11 through March 15, 2024, March 25, 2024, and April 5, 2024, via videoconference. The Parent of the Student whose education is at issue[1] appeared and was represented by Ryan Ford, attorney at law. The Peninsula School District (District) was represented by Carlos Chavez, attorney at law. Also present for the District was Janna Rush, Director of Special Education. Katie Hilen with the Tacoma School District observed the testimony of witnesses Nicole Lewis and Jennifer Seago.

<u>STATEMENT OF THE CASE</u>

**Procedural History**

The Parent filed a Due Process Hearing Request (Complaint) with the Office of Administrative Hearings (OAH) on July 28, 2023. The Complaint was given Cause No. 2023-SE-0130 and assigned to ALJ Joni Derifield. The District filed its Response to the Complaint on August 2, 2023.

ALJ Derifield issued a prehearing order on September 6, 2023, which set the hearing dates for March 11 through March 15, 2024. The Complaint was amended, effective September 27, 2023. On February 23, 2024, ALJ Derifield scheduled an additional half-day for the hearing. OAH reassigned the matter to ALJ Jill H. Brown on February 26, 2024. In orders dated March 15, 2024, and March 26, 2024, ALJ Brown scheduled two additional half-days for the hearing.

---

[1] To ensure confidentiality, names of parents and students are not used.

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2023-SE-0130
Docket No. 07-2023-OSPI-01971
8612 - OSPI
Page 1

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

**Due Date for Written Decision**

As set forth in the prehearing order dated September 6, 2023, the due date for a written decision in this matter was extended to thirty days after the record of the hearing closes at the Parent's request. The record of the hearing closed on June 3, 2024, after the parties submitted post-hearing briefs. Accordingly, the due date for a written decision is July 3, 2024.

**EVIDENCE RELIED UPON**

**Exhibits Admitted:**

District's Exhibits: D1 - D7, D9, D11 - D33;[2] and,

Parent's Exhibits: P1 -P15,[3] P18-P32H, P32J, P32L, P32O, P32Q-P32U, P32X-P32HH, P32JJ-P32BBB.

**Witnesses Heard (in order of appearance):**

- Elizabeth Comstock, District Speech and Language Pathologist
- Amy McCall, District Audiologist
- Emma Packard, Professional Development Specialist, Deafblind Program, Washington State School for the Blind
- Lindsay Pelander, District General Education Teacher
- Katie Humes, Associate Director, Deafblind Project, Washington State School for the Blind
- Samantha Ewing, District School Psychologist
- Justine Malek, District Special Education Teacher
- Linda Alsop, Director of the Program of Studies in Deafblindness at Utah State University

---

[2] Citations to the exhibits of record are by party (P for the Parent; D for the District) and page number. For example, a citation to P6 p1, refers to page 1 of Parent's Exhibit 6. Citations to the transcript of record are to "T" followed by the page number. For example, a citation to T214, refers to page 214 of the transcript. The Parent's exhibits include declarations with associated exhibits. A citation to an exhibit to a declaration will appear with the exhibit number for the declaration and the letter of the associated exhibit. For example, P32AA p3 refers to page 3 of exhibit AA of Parent's Exhibit 32.

[3] The Parent's Exhibit List identifies Exhibit 11 as "11.3.2021 FBA" and Exhibit 12 as "11.3.2021 Revaluation". The 11.3.2021 Reevaluation is actually marked as Exhibit 11 and the 11.3.2021 FBA is marked Exhibit 12.

Findings of Fact, Conclusions of Law, and Final Order
Cause No. 2023-SE-0130
Docket No. 07-2023-OSPI-01971
8612 - OSPI
Page 2

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA 98504-2489
(800) 845-8830
(206) 587-5135

- Nicole Lewis, Teacher of Visually Impaired, Tacoma School District
- Jennifer Seago, Teacher, Tacoma School District
- Diane "Dy" Thompson, Board Certified Behavior Analyst, Behavior Cusp, LLC
- Kari Hyatt, District Special Education Teacher
- Joel Eilers, District General Education Teacher
- Eleanor Ficca, District Aide/Paraeducator
- Meagan Crum, District Aide/Paraeducator
- April Crowder, District Aide/Paraeducator
- Loren Amici, District Occupational Therapist
- Gabriela Lewis, District Speech and Language Pathologist
- Julie Rodenberg, District Occupational Therapist
- Dawn Musgrove, Principal, Goodman Middle School
- Mary Daugherty, District Teacher of the Visually Impaired
- Jaime Wilson, PH.D., ABN, ABPP, MSCP, Prescribing Medical Psychologist & Board-Certified Neuropsychologist, Wilson Clinical Services, PLLC
- Janna Rush, District Director of Special Education
- Jennifer Pellegrini, Intervener
- Lynne Truitt, Former District Special Education Director
- Parent

## ISSUES

The issues for hearing, as set out in the September 28, 2023, <u>Order Granting Amendment and Setting Issues for Hearing</u>, are:

a.    Dating back two years from the date of filing of Parent's original Complaint, whether the District violated the Individuals with Disabilities Education Act (IDEA) by failing to offer the Student a free appropriate public education (FAPE) as follows:

  i.    At all times, failing to provide Student with Individualized Education Programs (IEPs) reasonably calculated to allow Student to make meaningful progress in all areas of educational programming by:

  ii.    Failing to timely update and/or implement Student's IEP during the 2021-2022 school year;

  iii.    Failing to timely provide Student with an adequately trained Intervener during the 2021-2022 school year;

Findings of Fact, Conclusions of Law, and Final Order
Cause No. 2023-SE-0130
Docket No. 07-2023-OSPI-01971
8612 - OSPI
Page 3

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA 98504-2489
(800) 845-8830
(206) 587-5135

iv.    Failing to timely provide Student with an adequately trained Intervener during the 2022-2023 school year, thus, prompting Parent to unilaterally place Student;

v.    Failing to timely provide Student with an adequately trained Intervener during the 2023-2024 school year;

vi.    Failing to provide Student with a Teacher of the Deaf and Hard of Hearing despite mounting evidence that Student required this service during the 2021-2022 school year;

vii.    Failing to timely provide Student with a Teacher of the Deaf and Hard of Hearing despite mounting evidence that Student required this service during the 2022-2023 school year;

viii.    Failing to timely provide Student with a Teacher of the Deaf and Hard of Hearing despite mounting evidence that Student required this service during the 2023-2024 school year;

ix.    At all relevant times, including the 2023-2024 school year, failing to timely provide an Intervener and/or other staff with the requisite skills to allow Student consistent and appropriate access to sign languages as a mode of communication so she could meaningfully benefit from her: (1) academic environment in the school setting, and (2) her social environment in the school setting;

x.    At all relevant times, failing to provide Student with instruction in Braille;[4]

xi.    At all relevant times, failing to provide Student with adequate instruction in sign language, which includes modified sign language, American Sign Language, and tactile sign language;

xii.    At all relevant times, creating and implementing an IEP that is not appropriate for Student on days when her vision is more negatively impacted due to her Cortical Visual Impairment (CVI);

xiii.    Failing to provide Student with appropriate extended school year (ESY) services during the summers prior to the 2021-2022 and 2022-2023 school years; and

---

[4] Based on the Parent's statement in her Post-Hearing Brief that "Parent is not pursuing the Braille issue for purposes of relief," the tribunal does not address the issues and request for relief related to Braille instruction. See issues a(x) and c(iv) and request for relief d(viii)(a). Parent's Post Hearing Brief p33.

Findings of Fact, Conclusions of Law, and Final Order
Cause No. 2023-SE-0130
Docket No. 07-2023-OSPI-01971
8612 - OSPI
Page 4

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA 98504-2489
(800) 845-8830
(206) 587-5135

xiv.    Failing to provide Student with an appropriate behavior intervention plan (BIP) subsequent to its November 2021 evaluation.

b.    Whether the Parent's unilateral placement of Student at St. Nicholas with a privately funded intervener was proper.

c.    Whether the District's November 2021 reevaluation was appropriate and whether the District failed to timely respond to Parent's request for an independent educational evaluation (IEE), specifically:

i.    The District's reevaluation frequently failed to utilize evaluators that were knowledgeable of sign language and capable of communicating with Student using sign language and, thus, did not evaluate Student in one of her primary modes of communication most likely to yield accurate information;

ii.    The assessments administered do not best ensure that based on Student's impairments, the results accurately reflect the Student's aptitude or achievement level or whatever other factors the test purports to measure;

iii.    The District's reevaluation failed to assist in the development of appropriate content for all areas of Student's IEP;

iv.    The District's reevaluation failed to determine that Student should qualify for instruction in Braille;

v.    The District's reevaluation failed to adequately evaluate Student to determine Student's capacity for communicating through sign languages and, thus, learning through sign languages;

vi.    The District's reevaluation failed to adequately determine how to meet Student's communication needs in the school setting when it was apparent during the evaluation that Student would not tolerate having devices on her ears;

vii.    The District's reevaluation failed to assess whether Student qualifies under the category of autism and determine appropriate programming based on her needs; and

viii.    The District failed to conduct an appropriate functional behavioral assessment (FBA) of Student as part of its evaluation.

d.    And, whether the Parent is entitled to her requested remedies:

i.    Declaratory relief that the District violated the IDEA and denied the Student a FAPE;

ii.    An Order that the District's reevaluation from November 2021 was not appropriate;

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2023-SE-0130
Docket No. 07-2023-OSPI-01971
8612 - OSPI
Page 5

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

iii.  An Order finding that Parent is entitled to reimbursement for all relevant costs paid by Parent for an IEE obtained by Parent for Student by Dr. Wilson, which also includes Dr. Wilson's attendance at Student's IEP team meeting(s) and may include observation of Student in her educational setting;

iv.  An Order that Parent be reimbursed for all out of pocket tuition and related costs, including interest, for St. Nicholas for the 2022-2023 school year to the extent there are out of pocket expenses;

v.  An order that Parent be reimbursed for all out of pocket expenses and related costs, including interest, for the private provider Intervener for the 2022-2023 school year to the extent there are out of pocket expenses;

vi.  An Order that the District will fund the attendance of Student's IEE providers at an ALJ mandated evaluation meeting(s) and IEP team meeting(s) and that the team will strongly consider the reports of Student's IEE providers when determining an appropriate placement for Student;

vii.  An Order that the District is required to provide Student with FAPE, which includes but is not limited to:

viii.  The provision of a nationally credentialed intervener or the equivalent thereto;

a.  Instruction in Braille by an instructor that meets Washington's competency requirements for the provision of Braille instruction by a certified school district employee;

b.  A service provider that is fluent in tactile sign language that serves Student's communication needs for access to tactile sign language during 100 percent of her school day;

c.  The provision of a Teacher of the Deaf and Hard of Hearing;

d.  An appropriate BIP;

e.  Continued training as it relates to sign language;

f.  Meeting(s) to determine whether Student qualifies under the category of autism and/or to determine additional information required to make an informed determination; and

g.  ESY services.

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2023-SE-0130
Docket No. 07-2023-OSPI-01971
8612 - OSPI
Page 6

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

ix.    An Order finding that Student is entitled to compensatory education determined just and equitable by the ALJ;

x.    An Order for District training of all District staff and administrators for each violation of the IDEA;

xi.    Or other equitable remedies, as appropriate.

<u>**FINDINGS OF FACT**</u>

In making these Findings of Fact, the logical consistency, persuasiveness and plausibility of the evidence has been considered and weighed. To the extent a Finding of Fact adopts one version of a matter on which the evidence is in conflict, the evidence adopted has been determined more credible than the conflicting evidence. A more detailed analysis of credibility and weight of the evidence may be discussed regarding specific facts at issue.

Some of the evidence presented was hearsay, which is a statement made outside of the hearing used to prove the truth of what is in the statement. In administrative hearings, hearsay evidence is admissible if, in the judgment of the presiding officer, "it is the kind of evidence on which reasonably prudent persons are accustomed to rely in the conduct of their affairs."[5] An ALJ may not base a finding of fact exclusively on hearsay evidence unless the ALJ determines that doing so "would not unduly abridge the parties' opportunities to confront witnesses and rebut evidence."[6] To the extent any findings of fact are based on hearsay, it is determined that such findings did not unduly abridge the parties' opportunity to confront witnesses and rebut evidence.

Background

1.    The Student is currently 13 years old and is in seventh grade. She attended Harbor Heights Elementary School (HHES) in the Peninsula School District (District) from preschool through fifth grade.[7] The Student attended sixth grade (2022-2023) at St. Nicholas Catholic School (St. Nick's).[8] She started seventh grade (2023-2024) at Goodman Middle School (Goodman) in the District; however, in September 2023, the Student transferred to the Tacoma School District to participate in the Deaf and Hard

---

[5] RCW 34.05.452(1).

[6] RCW 34.05.461(4).

[7] T31.

[8] P32LL;T1456-1458.

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2023-SE-0130
Docket No. 07-2023-OSPI-01971
8612 - OSPI
Page 7

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

of Hearing (DHH) program at Baker Middle School (Baker).[9] The Student remained in the Tacoma School District at the time of this hearing.[10]

2.      At age three years, the Student qualified for special education services under the category of Developmental Delays.[11] After a reevaluation in October 2019, when the Student was eleven, the District changed her eligibility category to Multiple Disabilities (Intellectual Disability, Health Impairment, and Visual Impairment) and found her eligible for specially designed instruction (SDI) in communication, reading, math, writing, social/emotional/behavioral, adaptive, and vision, with related services in gross and fine motor skills. The District added SDI in orientation/mobility in February 2020.[12]

3.      The Student was diagnosed with hearing loss at the age of two.[13] She has diagnoses of HUWE1 neurodevelopment disorder, microcephaly, and hypotonia.[14] She has retinal pigmentation/pigmentary retinal dystrophy, nystagmus, and wears glasses for anisometropia, high hyperopia, and accommodative esotropia.[15] She also has a diagnoses of Cortical Visual Impairment (CVI),[16] described as:

> a condition involving damage to the visual pathways and processing centers in the brain, rather than the eye anatomy. An individual with CVI has difficulty interpreting and connecting meaning to what they see. As a result, individuals with CVI rely on single-sense processing; they may have difficulty processing auditory, tactile and visual information simultaneously.[17]

4.      HUWE1 is a rare gene mutation that can have varied effects, including short stature, hearing loss, absence of speech, retinopathy, and strabismus (lack of eye focus).[18]

---

[9] D24 p3; T1427-28, 1460.

[10] P32 p1.

[11] P11 p5; D6 p5.

[12] D6 p5-6.

[13] P2 p3; P32B p.9.

[14] D2 p5.

[15] P18 p7; D2 pp5, 16-17; D6 p5.

[16] D2 p16.

[17] P11 p53; D2 pp16-17.

[18] T1397-1398.

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2023-SE-0130
Docket No. 07-2023-OSPI-01971
8612 - OSPI
Page 8

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

5.      The Student uses a gastronomy tube for nutrition. She receives iron twice daily at home and receives a home-prepared blended diet at school via her gastronomy tube, as well as water by the gastronomy tube when she requests it.[19]

6.      The Student is nonverbal. In 2020 through fall of 2023, she communicated using some adapted sign language, an alternative and augmentative communication (AAC) device, also referred to as a "talker," and an iPad.[20]

7.      The shape of the Student's hands and the position of her fingers limits her fine motor skills and dexterity when signing, using her AAC device, reading Braille, and using a calculator.[21] Because of her dexterity issues, the Student's sign language was often modified to her abilities.[22]

8.      The Student often used an AAC device during both her special education and general education classes. She began using the AAC device in her early elementary years.[23] Staff always ensured the Student had the AAC device with her, except during a rainy recess.[24] When using the AAC device, the Student would maneuver through different screens to find icons to press that, when combined, would form a phrase.[25]

### The 2020-2021 School Year

9.      During the 2020-2021 school year, the Student attended the fourth grade at HHES.

10.      On October 27, 2020, the Student's individualized education program (IEP) team met and developed the Student's IEP (October 2020 IEP).[26]

11.      The October 2020 IEP provided the Student with the following services and supplementary aids and services from October 30, 2020, through October 29, 2021:

---

[19] D2 p5; D6 p5.

[20] T32; T48; D6 p6.

[21] P32 p40; T661, T877, T1290.

[22] T 48, 450.

[23] T126.

[24] D17 p2.

[25] T38; T40.

[26] D2.

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2023-SE-0130
Docket No. 07-2023-OSPI-01971
8612 - OSPI
Page 9

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

**Services 10/30/2020 - 10/29/2021**

| Concurrent | Service(s) | Service Provider for Delivering Service | Monitor | Frequency | Location (setting) | Start Date | End Date |
|---|---|---|---|---|---|---|---|
| **Related** | | | | | | | |
| No | Gross Motor | PT | PT | 90 Minutes / Monthly | Special Education | 10/30/2020 | 10/29/2021 |
| No | Fine Motor | OT | OT | 45 Minutes / Monthly | Special Education | 10/30/2020 | 10/29/2021 |
| No | Fine Motor | OT | OT | 45 Minutes / Monthly | General Education | 10/30/2020 | 10/29/2021 |
| No | Communication | Sp Ed Teacher | Sp/Lang Path | 20 Minutes / Daily | General Education | 10/30/2020 | 10/29/2021 |
| **Special Education** | | | | | | | |
| No | Orientation & Mobility | Orientation/Mobility Specialist | Orientation /Mobility Specialist | 20 Minutes / 2 Times Monthly | Special Education | 10/30/2020 | 10/29/2021 |
| No | Adaptive Behavior | Paraeducator | Sp Ed Teacher | 45 Minutes / 5 Times Weekly | Special Education | 10/30/2020 | 10/29/2021 |
| No | Math | Paraeducator | Sp Ed Teacher | 60 Minutes / 5 Times Weekly | General Education | 10/30/2020 | 10/29/2021 |
| No | Reading | Paraeducator | Sp Ed Teacher | 30 Minutes / 5 Times Weekly | General Education | 10/30/2020 | 10/29/2021 |
| No | Social Emotional/Behavioral | Paraeducator | Sp Ed Teacher | 45 Minutes / 5 Times Weekly | General Education | 10/30/2020 | 10/29/2021 |
| No | Written Language | Paraeducator | Sp Ed Teacher | 30 Minutes / 5 Times Weekly | General Education | 10/30/2020 | 10/29/2021 |
| No | Vision | Vision Specialist | Vision Specialist | 30 Minutes / 1 Times Weekly | Special Education | 10/30/2020 | 10/29/2021 |
| No | Communication | Sp/Lang Path | Sp/Lang Path | 30 Minutes / 3 Times Monthly | Special Education | 10/30/2020 | 10/29/2021 |
| No | Communication | Sp/Lang Path | Sp/Lang Path | 30 Minutes / 3 Times Monthly | General Education | 10/30/2020 | 10/29/2021 |

Total minutes per week student spends in school: 1740 minutes per week
Total minutes per week student is served in a special education setting: 321.25 minutes per week
Percent of time in general education setting: 81.54% in General Education Setting

**Supplementary Aids and Services:**

| Concurrent | Service(s) | Service Provider for Delivering Service | Monitor | Frequency | Location (setting) | Start Date | End Date |
|---|---|---|---|---|---|---|---|
| No | Communication | Sp/Lang Path | Sp Ed Teacher | 30 Minutes / 1 Times Monthly | Special Education | 10/30/2020 | 10/29/2021 |
| No | Vision | Vision Specialist | Vision Specialist | 15 Minutes / 1 Times Weekly | General Education | 10/30/2020 | 10/29/2021 |
| No | Paraeducator | Paraeducator | Sp Ed Teacher | 273 Minutes / Daily | General Education | 10/30/2020 | 10/29/2021 |
| No | Paraeducator | Paraeducator | Sp Ed Teacher | 75 Minutes / Daily | Special Education | 10/30/2020 | 10/29/2021 |

12.     The October 2020 IEP provided the Student would spend 81% of her time in the general education setting.[27] This was an increase from 57% of her time in the general education setting under the Student's prior IEP.[28] The Student's time in general education increased because the "[p]arents believe it is important for student to spend the maximum of amount of time possible in general education setting with non-disabled peers."[29]

13.     The October 2020 IEP provided multiple accommodations including twelve based on vision.[30]

---

[27] D2 pp24, 26

[28] D1 p7.

[29] D2 p26.

[30] D2 pp20-22.

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2023-SE-0130
Docket No. 07-2023-OSPI-01971
8612 - OSPI
Page 10

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

14.    The October 2020 IEP noted that the Student "has significant language delay and is nonverbal. She benefits from the use of a high-tech communication device and some functional signs."[31]

15.    In October 2020, the Student primarily used her AAC device to communicate at school.[32] The October 2020 IEP did not provide a Teacher of the Deaf (ToD) or an intervener and stated that instruction in Braille was not recommended at that time.[33]

16.    The Parent expressed a desire that the IEP team increase the Student's sign language vocabulary.[34] Accordingly, the October 2020 IEP included a communication goal focused on improving the Student's use of functional sign language.[35]

17.    By email on January 26, 2021, Katie Humes,[36] Director of the Washington State DeafBlind Project, informed the Parent that the Student was added to the Washington State Deaf-Blind Child Count.[37] Ms. Humes let the Parent know that an auditory brainstem response (ABR) test and a functional listening evaluation (FLE) could help determine the status and impact of the Student's hearing loss.[38] The Student's placement on the Washington State Deaf-Blind Child Count was based partly on the Student's documented hearing loss at age two.[39] The record does not show a documented hearing loss as of January 2021.[40]

18.    The October 2020 IEP did not provide for extended school year (ESY) services; however, by email dated June 4, 2021, the District offered ESY services for the Student.[41]  After the District informed the Parent that it was attempting to find staff to provide the ESY services, the Parent requested that the District contract with the Student's outside behavior support provider, Dy Thompson; the District declined the

---

[31] D2 p4.

[32] D2 p12.

[33] D1 p20; D2 p4.

[34] D2 p12.

[35] D2 p14.

[36] Ms. Humes has a degree in child development, an AAS degree in sign language interpreting and deaf studies, and a master's degree that required on-the-job training working with birth to five-year-olds who were deaf and hard of hearing, some of whom were also deafblind. She has been the director of the Washington DeafBlind Program since 2015.

[37] P2 p3.

[38] P2 p4.

[39] P2 p3.

[40] D1 p20.

[41] D2 p27; P32 p2; P32A p19.

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2023-SE-0130
Docket No. 07-2023-OSPI-01971
8612 - OSPI
Page 11

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

Parent's request.[42] The District informed the Parent that the summer classroom teacher certified in special education would develop the ESY classroom schedule. The District let the Parent know it would provide transportation for the Student and a paraeducator would be on the bus.[43] On July 7, 2021, the Parent declined the ESY services offered by the District.[44]

### The 2021-2022 School Year

19.    During the 2021-2022 school year, the Student was a fifth-grade student at HHES. The October 2020 IEP was still in place at the start of the school year.

20.    The Student's placement at HHES was in the Options Program.[45] The Options Program is a "self-contained program focused on life skills and functional academics with high structure and a high staff to student ratio."[46] The Student's special education teacher and case manager in fifth grade was Justine Malek.[47] [48] Consistent with the October 2020 IEP, the Student spent a portion of her day in the general education setting and received intensive SDI in the special education setting.[49]

21.    The Options Program is not a DHH program and, while some nonverbal students in the program used some sign language, no students in the Options Program used sign language as their primary mode of communication when the Student was in the program.[50] None of the Student's teachers or service providers at HHES had experience working with a deafblind student.[51]

22.    The Student's team at HHES and the Parent shared a communication log. Each morning the Parent would report how the Student's evening and morning had gone

---

[42] P32 p2; P32A pp 13-16.

[43] P32A 10-12.

[44] P32 p2; P32A pp 2-8.

[45] T448.

[46] P11 p5, D6 p5.

[47] T1150.

[48] Ms. Malek has a bachelor's degree in elementary and special education and a master's degree in curriculum and instruction. She has been teaching in special education since 2018 and has worked for the District as a special education teacher since 2020. T410.

[49] P11 p5, D6 p5.

[50] T68.

[51] T108, 409, 773, 814, 837, 866, 869, 878, 947, 969.

and each afternoon, Ms. Malek would report what the Student had worked on that day.[52]

23.    During the fifth grade, the Student received communication services from Speech Language Pathologist (SLP) Elizabeth Comstock[53] and vision services from TSVI (Teacher of Students with Visual Impairments), Elise Bullinger-Sandstrom.[54]

### Reevaluation

24.    By prior written notice (PWN) dated September 3, 2021, the District proposed a comprehensive reevaluation of the Student to consider new assessment data provided to the District.[55] The District also agreed to consider a June 2021 ophthalmology assessment plan and a July 2021 audiological evaluation provided by the Parent.[56]

25.    On September 20, 2021, the Parent signed a consent for reevaluation (Consent Form) in the following areas: review of existing data, audiology, social/emotional/behavioral, math, writing, fine motor, vision/orientation and mobility, student observation, functional behavioral assessment (FBA), medical-physical, general education, adaptive, cognitive, reading, communication, and gross motor.[57] On the Consent Form, the Parent suggested the following "areas of need" be considered when assessing the Student:

> I am requesting the district work in collaboration with our outside Behavioral Specialist to gather data, develop functional hypothesis, etc., for the Functional Behavior Assessment. I am requesting the district work in collaboration with the DeafBlind project to also provide functional visual assessment(s) along with Elise Sandstrom the district's TVI.[58]

---

[52] D13; T1151-1153.

[53] Ms. Comstock has a master's degree in communication disorders. She has worked as a speech language pathologist for over thirty years, with at least eighteen of those years as a District employee. T30.

[54] D6 p1; T81-83.

[55] P5; P11 pp3-4; D3.

[56] P5 p3.

[57] P11 pp107-108.

[58] P11 p107.

26.    On the Consent Form, the Parent added "behavior" to the areas the reevaluation should address. The Parent did not raise concerns about autism on the Consent Form.[59] The Parent did not request an American Sign Language (ASL) assessment on the Consent Form.[60]

27.    According to the October 2020 IEP, the Student's next annual IEP meeting was due to occur by October 27, 2021, and the IEP "start date" was October 30, 2021.[61] However, IEP team members including the Parent agreed to wait to draft the new IEP until after the reevaluation had been completed.

28.    The District documented this decision in a PWN dated October 28, 2021:

> The team, which included the parent, discussed continuing the IEP while it completes the new evaluation. The evaluation team received consent on 9/20/2021 to begin a comprehensive evaluation of the student. [T]he team decided that continuing the current IEP while completing the evaluation was the best course of action at this time. The parent agreed by email on 10/19/2021 to continue the current IEP as long as the only changes made were the IEP start date and end date was the only information changed. The parent stated in the e-mail that she would agree to an end date of 11/29/2021.[62]

29.    On November 3, 2021, and November 8, 2021, the Student's reevaluation team met to review and discuss the assessments performed as part of Student's recent reevaluation (November 2021 Reevaluation or Reevaluation).[63] The District evaluated the Student in all of the areas marked on the consent form.[64] The reevaluation team consisted of Shelly Donohue, Physical Therapist (PT); Emma Packard, Vision Specialist;[65] Melanie Upchurch, Assistive Technology; Joe Dlugo, Vision Specialist; Ms. Bullinger-

---

[59] P11 107-108; T1452.

[60] P11 p107.

[61] D2p1.

[62] P10 p29; D5 p2.

[63] P11 p5; D6 pp1, 9.

[64] P11 pp11-73; P12 pp2-4.

[65] Ms. Packard has master's degrees in low incidence disabilities and teaching students with low vision and blindness, with an endorsement in orientation and mobility. In June 2023, she earned a master's degree in teaching students who are deafblind. She has been involved in the deafblind community since 1996, has worked with the Washington DeafBlind Program since 2007, and has been a teacher of students with low vision and blindness and an orientation and mobility specialist since 2014.T184-185.

Sandstrom, Vision Specialist; Samantha Ewing, Psychologist;[66] Ms. Comstock, SLP; Lynne Truitt, District Representative;[67] Ms. Malek, Special Education Teacher; Julie Rodenberg, Assistive Technology;[68] Tracy Chappell, Occupational Therapist (OT); Lindsay Pelander, General Education Teacher;[69] Amy McCall, Audiologist;[70] the Parent; and Allison Shepard, District Representative.[71]

30.    District psychologist Samantha Ewing evaluated the Student for the medical-physical portion of the November 2021 Reevaluation.[72] Ms. Ewing has taught sign language and uses functional sign language but does not communicate using tactile sign language.[73] Prior to evaluating the Student, Ms. Ewing did not have experience evaluating a deafblind student.[74] To communicate during the Reevaluation, the Student would use her AAC device if she chose to. For the most part, Ms. Ewing communicated verbally to the Student and the Student would point to her responses.[75]

31.    Ms. Ewing reviewed the Student's health and developmental history and considered the Student's medical diagnoses.[76]

---

[66] Ms. Ewing has a bachelor's degree in psychology and an educational specialist degree in school psychology. She had an internship with the District in 2019 when earning her school psychology degree and has been working for the District as a school psychologist since 2020. T350.

[67] Ms. Truitt has a bachelor's degree in special education. She has a master's degree in educational administration. She has taught full-time before becoming an administrator. She was Director of Special Education at the District for two years. She is currently a special education physical program supervisor with OSPI. T1328-1330.

[68] Ms. Rodenberg has a master's degree in occupational therapy and has been an occupational therapist for ten years. She has been employed by the District for seven years. T933-935.

[69] Ms. Pelander has a master's degree in teaching and a secondary certification in math. She has worked with various school districts since 2006. She has been a general education teacher with the District since 2021. T258-259.

[70] Ms. McCall has a bachelor's degree in hearing and speech and a master's degree in audiology. After earning her master's degree in 1987 she worked with the Family Conversations program, working with deaf and hard of hearing children from birth to three years old. She has worked as an audiologist for various school districts, including for the District for the past 14 years. T130-131.

[71] P11 p1; D6 p9.

[72] P11 p11; D6 p11.

[73] P25 p10.

[74] T354.

[75] T361.

[76] P11 p11; D6 p11.

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2023-SE-0130
Docket No. 07-2023-OSPI-01971
8612 - OSPI
Page 15

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

32.    A letter from Dr. K. David Eply dated November June 9, 2021, reported the Student's vision was 20/1400 in both her right and left eyes with her best correction.[77] Vison of 20/200 is considered legally blind.[78]

33.    Regarding the Student's hearing, the November 2021 Reevaluation notes that,

> [i]n a report dated 7/20/21, Lisa Mancl, Pediatric Audiologist, indicated that [the Student] demonstrates mild hearing loss. Specifically, she demonstrates soundfield behavioral hearing thresholds to frequency specific stimuli at 500, 1000, 2000, and 4000 Hz at levels of 30, 20, 40 and 40 dbHL (soundfield testing does not isolate hearing in each ear). Ear specific testing was not attempted due to [the Student]'s refusal of headphones.[79]

34.    Ms. Ewing noted that the Student's multiple health impairments "can impact her acquisition of academic skills, her motor skills, her ability to communicate, her independence and self-care selfcare skills, as well as her social/emotional /behavioral skills."[80]

35.    District audiologist Amy McCall evaluated the Student's audiology needs for the November 2021 Reevaluation.[81] Ms. McCall performed a record review of the brainstem auditory evoked response (BAER) test performed on May 27, 2021.[82] The BAER test results revealed a mild to moderate sensorineural hearing loss across the pitch range 500 Hz to 4000 Hz in both ears.[83] Ms. McCall also reviewed the results of sound booth testing, which measures behavioral response to sound, performed on the Student on July 20, 2021. The sound booth testing results were in agreement with the BAER testing results, showing a mild hearing loss.[84] The pediatric audiologist who conducted the sound booth testing reported that the Student is a candidate for hearing aids.[85]

36.    As part of her audiology assessment, Ms. McCall observed the Student during physical therapy (PT), in the Options classroom, and during three general education

---

[77] P11 p11; P32B pp7-8; D6 p11.

[78] T195.

[79] P11 p11; D6 p11.

[80] P11 p11.

[81] P11 p12; D6 p12.

[82] P11 p12; T135.

[83] P11 p12; D6 p12.

[84] P11 p12; P32B p10.

[85] P11 p12; P31B p10; D6 p12.

classes.[86] Ms. McCall summarized that the Student likely has difficulty hearing in a noisy environment when using either the AAC or iPad. She also noted that facemasks used at that time due to the Covid-19 pandemic created a communication barrier for the Student as they made it difficult to know who was talking, hindered lip reading, hid facial cues, and degraded the quality of speech.[87]

37.     To provide the Student with adequate auditory access in all her educational settings, Ms. McCall recommended that the Student sit in the second row and that she use mild gain hearing aids in combination with an FM (frequency modulation)/DM (digital modulation) system.[88] An FM/DM system consists of a transmitter and one or two receivers. The transmitter is worn by the main speaker, while the receivers are worn by the listener.[89] If the Student was unable to use the recommended assistive listening devices, Ms. McCall suggested the Student's learning environment be modified to a quiet learning environment where she would listen to one person at a time.[90] Based on her own observation of the Student, Ms. McCall believed that the Student had appropriate access to her educational environment:

> [i]f she was in one-on-one interaction in a quieter room ... if she was in a smaller group where the noise level in the room was controlled, I felt she did have good access. If she was in a larger group where the students were working quietly, I felt she had good access. If she was in the larger gen ed [general education] classroom where it was noisier, I felt she did not have good access.[91]

38.     There is no evidence that the District had any documentation that the Student had a hearing loss that would qualify her for special education audiology services prior to the July 20, 2021 report from the sound booth testing.[92]

39.     Ms. McCall recommended audiology support as a supplementary aid and service.[93]

40.     Ms. Ewing also conducted the general education section of the reevaluation, which focused on the Student's performance, participation, and need for support in

---

[86] P11 p12; D6 p12.

[87] P11 p14.

[88] P11 p14.

[89] T136.

[90] P11 p14.

[91] T144-145.

[92] T169; T177.

[93] P11 p14; D6 pp6, 8.

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2023-SE-0130
Docket No. 07-2023-OSPI-01971
8612 - OSPI
Page 17

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

the general education setting.[94] Input from the Student's general education teachers and her special education teacher showed the Student was most successful when given one-to-one (1:1) instruction in a quiet place, using visuals and tactile learning materials. The Student did not need more than one minute to comply with instructions. She recognized the letters A, B, C, D, G, H, K, L, P, and T. She was most successful in reading when there was a single word paired with an image on each page. When writing, the Student was able to form three-word sentences with adult assistance. She required an average of five to seven prompts per sentence. The Student was working on identifying numbers and 1:1 counting. She was unable to independently input addition and multiplication problems into a calculator but could do so with hand under hand support from an adult.[95]

41.    Ms. Ewing also conducted the social/emotional/behavioral section of the reevaluation. She assessed the Student's social/emotional/behavioral needs using the Behavior Assessment System for Children, 3rd Edition (BASC-3), and the School Function Assessment (SFA).[96]

42.    The BASC-3 is a nationally normed measure that gathers information from teachers and parents and includes measures of positive (adaptive) behaviors and negative (maladaptive) behaviors. Ratings are compared to a national sample of same-age peers.[97] Ms. Pelander, the Student's general education teacher, Ms. Malek, her special education teacher, and the Parent completed the BASC-3 rating scale. Their responses were internally consistent and not considered to be overly negative or positive. Both teachers and the Parent rated Internalizing and Externalizing Problems Composites within the average range and the School Problems and Adaptive Skills Composites within the clinically significant range. Ms. Pelander's overall Behavioral Symptoms Index fell into the average range when compared to same-age peers. Ms. Malek's overall Behavioral Symptoms Index fell within the at-risk range when compared to same-age peers. The Parent's overall Behavioral Symptoms Index fell within the clinically significant range when compared to same age peers.[98]

43.    The BASC- 3 rating scale results included the following significant findings:

General education teacher ratings within the at-risk range include attention problems. Ratings within the clinically significant range include

---

[94] P11 p14; D6 p14.

[95] P11 pp15-16.

[96] P11 p16; D6 p16-17.

[97] P11 p16; D6 p16.

[98] P11 p17; D6 p17.

learning problems, social skills, leadership, study skills, and functional communication. Specific ratings related to elevated scales include that [the Student] almost always has reading problems, has problems with mathematics, has trouble keeping up in class, has spelling problems, has a short attention span, is easily distracted from classwork and has trouble concentrating.

\*\*\*

Special education teacher ratings within the at-risk range include attention problems, social skills, and leadership. Ratings within the clinically significant range include learning problems, atypicality, withdrawal, study skills, and functional communication. Specific ratings related to elevated scales include that [the Student] almost always has a short attention span, is easily distracted from classwork, and has trouble concentrating, has reading problems, has problems with mathematics, has trouble keeping up in class, has spelling problems has trouble making new friends, and prefers to play alone.

\*\*\*

Parent ratings within the at-risk range include hyperactivity, withdrawal, and leadership. Ratings within the clinically significant range include aggression, attention problems, atypicality, social skills, functional communication, and activities of daily living. Specific ratings related to elevated scales include that [the Student] almost always throws or breaks things when angry, has a short attention span, is easily distracted, and seems unaware of others.

\*\*\*

The Student's overall behavior skills based on parent and teacher ratings fall within the average range and at risk range in the school setting and the clinically significant range in the home setting.[99]

44.    The Student's BASC-3 results showed

a clinically significant Developmental Social Disorders content scale score. This suggests that [the Student] may be exhibiting problems with self-stimulation, withdrawal, and inappropriate socialization. This is

---

[99] P11 pp17-18; D6 pp17-18.

Findings of Fact, Conclusions of Law, and Final Order
Cause No. 2023-SE-0130
Docket No. 07-2023-OSPI-01971
8612 - OSPI
Page 19

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA 98504-2489
(800) 845-8830
(206) 587-5135

consistent with her elevated Atypicality and Withdrawal scale scores. Diagnostic consideration given this elevated content scale score may include pervasive developmental disorders such as autism spectrum disorder; however, high scores on this scale may also represent poor socialization. [The Student]'s profile is also characterized by elevated attention problems, withdrawal, and atypicality scale scores. Elevations on these scales may indicate that an autism spectrum disorder diagnosis is more likely, although other factors may also account for these concurrent elevations. Thus, given the complexity of an autism spectrum disorder diagnosis, additional clinical interviewing and history-taking will likely be necessary before rendering diagnostic conclusions.[100]

45.    After reviewing the BASC-3 results, Ms. Ewing did not follow-up to determine if the Student may qualify in the area of autism spectrum disorder because she believes the BASC-3 results alone are not a reliable indicator that a student is on the autism spectrum. She noted, "I wouldn't see that and say 'I think that this student is likely to have autism' just as a standalone measure because there is a lot of other things that can cause that response pattern for a student."[101] She also did not make a follow-up determination about autism because that was not a question or concern raised by District teachers or staff or the Student's family.[102] Ms. Ewing noted that the Student

was getting special education services and adaptive social/emotional, behavioral, communication, motor, all areas that students who have autism spectrum disorder can have services in. ... [I]f we suspected that she had autism, it wouldn't have changed what support she was given.[103]

46.    The SFA is a judgment-based assessment that measures performance of functional tasks supporting participation in physical, academic, and social aspects of students.[104] It is a checklist the team uses to determine if the Student is able to perform skills or whether the Student is engaging in skills that are measured.[105] Behaviors are rated from level 1 to level 4 (Level 1 means "Does Not Perform"; level 2 means "Partial Performance"; level 3 means "Inconsistent Performance"; and level 4 means "Consistent

---

[100] P9 pp14-15.

[101] T363.

[102] T363.

[103] T364.

[104] P11 p18; D6 p18.

[105] T373.

Findings of Fact, Conclusions of Law, and Final Order
Cause No. 2023-SE-0130
Docket No. 07-2023-OSPI-01971
8612 - OSPI
Page 20

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA 98504-2489
(800) 845-8830
(206) 587-5135

Performance"). The Student's special education teacher, occupational therapist, and speech/language pathologist completed the Student's SFA.[106]

47.    The SFA of the Student's adaptive skills showed rating levels 1 and 2 for activities related to personal care awareness, and levels 1, 2, and 3 for safety awareness activities.[107]

48.    Based on the results of the BASC- 3 and the SFA, Ms. Ewing recommended continued SDI in social/emotional/behavioral skills.[108]

49.    Ms. Ewing assessed the Student's adaptive skills as part of the November 2021 Reevaluation using the Adaptive Behavior Assessment System Third Edition (ABAS 3) and the SFA. The Parent, Ms. Pelander, and Ms. Malek completed ABAS-3 Forms, which measure the adaptive skills that have primary relevance for children's functioning in the home and community.[109] As discussed in the reevaluation report:

> The General Adaptive, Practical Conceptual, And Social Composites fell within the extremely low range when compared to same age peers in both the home and school environment. Social is an area of relative strength for [the Student] at school. [The Student]'s mother rated her adaptive behaviors in the extremely low range for communication, community use, functional academics, home living, health and safety, leisure, self-care, self-direction, and social tasks. [The Student]'s teachers rated her adaptive behaviors in the extremely low range for communication, functional academics, self-direction, leisure, community use, social living, health and safety, and self-care skills; her general education teacher rated [the Student]'s social skills within the extremely low range and her special education teacher rated [the Student]'s social skills within the low range when compared to same age peers.[110]

50.    Ms. Ewing recommended SDI in adaptive/self-help skills.[111]

51.    Ms. Ewing assessed the Student's Cognitive functioning using the Comprehensive Test of Nonverbal Intelligence – Second Edition (CTONI-2) and the

---

[106] P11 p18; D6 p18.

[107] P11 p22; D6 p22.

[108] P11 p19; D6 pp7, 19.

[109] P11 p19; D6 p19.

[110] P11 p21.

[111] P11 p22; D6 pp7, 22.

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2023-SE-0130
Docket No. 07-2023-OSPI-01971
8612 - OSPI
Page 21

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

SFA.[112] The CTONI-2 measures several nonverbal intellectual abilities through tasks involving analogies, categories, and sequences.[113] Ms. Ewing estimates that she has administered the CTONI-2 to between 5 and 15 students per year since joining the District in 2019.[114] Ms. Ewing chose the CTONI-2 to administer to the Student because the test of a nonverbal assessment and the instructions and directions for the tasks are relatively simple.[115] The Student's CTONI-2 scores placed her in the "very poor" range.[116] The SFA of the Student's cognitive functioning shows rating levels 1, 2 and 4 for activities related to functional communication, and levels 1, 2, and 3 for memory and understanding.[117]

52.    Ms. Ewing did not administer an academic achievement test during her assessment of the Student because, "the academic achievement tests have pretty complex verbal instructions, and are not usually appropriate to administer to students who have limited verbal skills or who might not understand what is being asked of them."[118] To assess the Student's academic achievement, Ms. Ewing used classroom data from the Student's special education teacher and she used a checklist of functional academic skills that students can perform either independently or with adult support.[119] She did not consult with anyone who has experience testing deafblind children to determine if it was feasible to administer an academic achievement test to the Student.[120]

53.    To assess the Student in the areas of math, reading, and writing, Ms. Ewing considered input from the Student's special education teacher, classroom data, and progress toward IEP goals. Ms. Ewing also reviewed an Independent Educational Evaluation (IEE) conducted in December 2020, which had administered the Styer-Fitzgerald Program for Functional Academics Student Assessment.[121] The Student was able to identify the concepts of small/big and short/long and was able to identify the number one. She was able to identify her own name when reading a list of other names beginning with the same letter and she identified ten capital letters. She was able to

---

[112] P11 p22-24; D6 pp22-24.

[113] P11 p23; D6 p23.

[114] T360.

[115] T384.

[116] P11 p23; D6 p23.

[117] P11 p24; D6 p24.

[118] T360.

[119] T361.

[120] T360.

[121] P11 pp24-28; D6 pp6, 24-28.

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2023-SE-0130
Docket No. 07-2023-OSPI-01971
8612 - OSPI
Page 22

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

write her first name and used her AAC device to form three-word sentences with assistance.[122] Ms. Ewing determined that the Student continued to be eligible for and in need of SDI in math, reading, and writing.[123]

54.    SLP Elizabeth Comstock conducted the communication portion of the evaluation.[124] Ms. Comstock reviewed the Student's educational history and progress toward her communication goals. The Student had met two of four IEP communication goals. Ms. Comstock used the K-12 Life Skills Communication Checklist in her assessment and determined the Student gained four new skills since her last evaluation.[125] The K-12 Life Skills Communication Checklist is an informal measure Ms. Comstock uses with emerging communicators.[126] A Language Sample collected showed the Student used a mean length of utterance of 2.75. She was able to locate the following words/phrases independently on her talker: hi, close the door, volume up, funny, bathroom, yes/no, numbers 5 and 10, thank you, new mask please, playdough, mom, how are you, pumpkin, puzzle, and wheelchair.[127] Ms. Comstock informally tested receptive vocabulary through the Peabody Picture Vocabulary Test 4 and found the Student was unable to form a basal (base) score.[128] The Peabody Picture Vocabulary Test 4 is a standardized communication assessment.[129] An AAC checklist showed the Student was in Stage 2 of language acquisition. She was able to combine two and three words with minimal prompting to make phrases, direct actions, and express requests.[130] Ms. Comstock considers minimal prompting to be one or two prompts.[131] Ms. Comstock noted that the Student remained nonverbal at school; although she will vocalize "aaahhhh" to get attention.[132]

55.    Ms. Comstock also administered the Functional Communication Profile-Revised (FCP-R), which is an overall inventory of an individual's communication abilities, mode of communication, and degree of independence. The FCP-R is not a standardized assessment tool; it does not compare a student's skills to their peer's

---

[122] D6 p6.

[123] P11 pp24-28; D6 pp24-28.

[124] P11 p28.

[125] P11 p29; D6, p29; T83-84.

[126] T84.

[127] P11 pp29-30; D6 pp29-30.

[128] P11 p30; D6 p30; T86.

[129] T85.

[130] P11 p30; D6 p30.

[131] T40.

[132] P11 p30; D6 p30.

skills.[133] The FCP-R is a checklist that breaks down communication into specific areas, based on observation of a student. Ms. Comstock has used the FCP-R checklist with other students.[134] The testing showed the Student demonstrated a significant communication delay in addition to her multiple disabilities.[135]

56.      Ms. Comstock saw pros and cons to using the AAC device. Because the Student had "motoric difficulty" manipulating her hands into different signs, she could access more advanced vocabulary with the AAC device. Signing was more accessible because it was always with the Student; however, it depended on others understanding her signs. Ms. Comstock did not favor one communication method over the other. "I was providing her with both and watching her progress and supporting her with both."[136]

57.      Ms. Comstock also considered that the Student had met a goal to use eight to ten adapted signs routinely in the classroom setting. According to the Reevaluation, "[the Student] uses adapted signs for talker, please, help, baby, thank you, swing, walk, car, go, wheelchair, wash. She is working on signs for sleep, wait, backpack, hug, jump."[137]

58.      At the time of the November 2021 Reevaluation, the Student knew between 20 and 30 adapted signs.[138] The Student's signs were "adapted" to adjust for her motor delays.[139]

59.      Ms. Comstock recommended that Student receive communication as a "related service," rather than SDI.[140] The District defines "related services" as

> Services that are provided to the student in collaboration with the classroom special education team. Related services may or may not have individual goals, and if special therapy goals were not included in the IEP then the therapist will identify an existing IEP goal to support. The Related Services model allows for collaboration and support among staff so the student is able to work on skills throughout the school day, with fewer pull-out sessions (though these may still occur) and more

---

[133] P11 p30; D6 p30.

[134] T45.

[135] P11 p38; D6 p38.

[136] T121.

[137] P11 p29.

[138] P11 p34.

[139] T48.

[140] P11 p38; D6 p38.

teaching and learning in the student's LRE. The student still receives individualized support and instructional time with their therapy team.[141]

60.    According to Ms. Comstock, when a student is younger, they will receive SDI for speech therapy. Then, as the student ages through the system, the District directs the SLP to provide speech therapy as a related service.[142] She believes this is why the Student began receiving SLP as a related service.[143] During the Student's fifth grade year, Ms. Comstock continued providing the same speech therapy that she had always provided the Student.[144]

61.    Ms. Comstock recommended that the Student be encouraged to continue using her AAC device.[145] She noted that the Student is a complex communicator with an emerging sign language system and emerging communication on the AAC device. She believed that the Student should continue with multimodal communication, using her adaptive signs, gestures, and her AAC device.[146]

62.    Ms. Comstock noted in her recommendations that the Student required significant modifications to her environment to engage in communication activities.[147]

63.    Ms. Comstock had concerns about implementing her recommendations when the Student spent more than 80% of her time in the general education setting. She described working in the general education setting as follows:

> … there is a lot going on in a general education classroom, especially 5th grade, 30 kids, teachers instructing from the front of the room. I think it would be frustrating to try to listen in that setting with a mild hearing loss and then signing input, having someone model on a device for you. I just think it would get frustrating.[148]

\*\*\*

---

[141] P11 p38; D6 p30.

[142] T42

[143] T42.

[144] T43.

[145] P11 p38.

[146] T51.

[147] D6 p39.

[148] T92.

Findings of Fact, Conclusions of Law, and Final Order
Cause No. 2023-SE-0130
Docket No. 07-2023-OSPI-01971
8612 - OSPI
Page 25

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA 98504-2489
(800) 845-8830
(206) 587-5135

...when you are sitting in the general education classroom, it is very hard to provide speech therapy, because the teacher is talking and they don't want you to talk.[149]

64.    Tracy Chappell assessed the Student's fine motor skills for the November 2021 Reevaluation.[150] She reviewed the Student's history and conducted a skilled clinical observation. Ms. Chappell attempted to administer the Bruininks-Oseretsky Test of Motor Proficiency, Second Edition, but could not obtain standarized scores because the test needed to be delivered in a non-standardized manner due to the Student's visual deficits, need for increased processing time, and repeating of verbal directions.[151] An SFA was also performed to assess the Student's participation, task supports, and activity performance.[152] Ms. Chappell also reviewed the IEE conducted in December 2020. Based on her assessment, Ms. Chappell concluded that the Student continued to need school-based occupational therapy as a related service to address fine motor deficits, and 1:1 assistance with fine motor tasks in class.[153]

65.    Ms. Donohue, a District PT, assessed the Student's gross motor skills. She reviewed the Student's records and performed the following testing: an SFA, Functional Mobility Skills, Timed Up and Go Test, and Pediatric Berg Balancing Test.[154] Ms. Donohue concluded that the Student required gross motor services and recommended support by a physical therapist as a related service.[155]

66.    Emma Packard, M.Ed./M.A., Teacher for the Visually Impaired (TVI), OMS, Consultant from the DeafBlind Program, assessed the Student's vision and mobility.[156] Ms. Packard is a deafblind intervener coach through Central Michigan University.[157]

67.    Ms. Packard reviewed available records, conversed with the Student's paraeducator, teacher, and Parent, and observed the Student in various settings. Ms. Packard conducted a CVI range as part of the assessment.[158] A CVI range is an

---

[149] T105.

[150] P11 p39; D6 p39.

[151] D6 p39.

[152] P11 p39; D6 p39.

[153] P11 p43; D6 p43.

[154] P11 p43; D6 p43.

[155] P11 p46; D6 p46.

[156] P11 p49; D6 p49

[157] T187.

[158] P11 p49; D6 p49.

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2023-SE-0130
Docket No. 07-2023-OSPI-01971
8612 - OSPI
Page 26

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

assessment tool that examines visual behaviors and visual functioning for people with CVI.[159] The Student's CVI range assessment score indicated that she was "integrating vision with function and is starting to resolve many of the characteristics of CVI."[160] Based on the reevaluation, Ms. Packard concluded that the Student had a visual impairment that adversely affected her ability to access her education. She also concluded that the Student qualified for SDI in the area of vision and consultation from a teacher of the visually impaired.[161]

68.    As a result of the evaluation, Ms. Packard recommended SDI in the area of vision, consultation from a TSVI, trial hearing aids paired with an FM/DM system, and accommodations. [162]

69.    Elise Bullinger-Sandstrom, M.Ed., District TSVI, also assessed the Student in the area of vision and mobility and conducted a functional vision assessment (FVA).[163] Ms. Bullinger-Sandstrom reviewed records, observed classroom performance, performed a direct assessment, interviewed the Parent, and interviewed teachers. A Learning Media Assessment and an Expanded Core Curriculum Screening were included as part of the FVA.[164] The Learning Media Assessment showed the Student's appropriate learning media is print; therefore, Ms. Bullinger-Sandstrom determined instruction in Braille was not warranted at that time, but should be considered annually or sooner as needed due to the potential progression of retinal pigmentation.[165] Ms. Bullinger-Sandstrom concluded that the Student had a visual impairment that adversely affected her ability to access her education. She recommended that the Student receive vision services from a TSVI, "which include but are not limited to instruction, observations, consultation, and recommendations for materials, supports, and accommodations to support her access to her educational curriculum and environment."[166]

70.    Gloria Hiten, MS, Certified Orientation & Mobility Specialist, assessed the Student for Orientation and Mobility.[167] Ms. Hiten concluded that the Student required

---

[159] P11 p50.

[160] D6 p51.

[161] P11 pp51-52; D6 pp51-52.

[162] P11 p52; D6 p52.

[163] P11 p52; D6 p52.

[164] P11 p52; D6 p52.

[165] P11 p54; D6 p54.

[166] P11 p57; D6 p57.

[167] P11 pp57-59; D6 pp57-59.

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2023-SE-0130
Docket No. 07-2023-OSPI-01971
8612 - OSPI
Page 27

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

related services to increase her safety, efficiency, and independence when navigating the world as an individual with a visual impairment.[168]

71.    Ms. Ewing observed the Student in her social studies and math general education classes as part of the "observation" portion of the evaluation.[169] According to Ms. Ewing,

> The purpose of the observations were to look at her behaviors. I believe that we were targeting work refusal for her functional behavior assessment, and so the observations were at work times to see if there were work refusal or avoidance behaviors, and if so, what were they, what behaviors did we see and what the staff or adult responses to those behaviors were and then what she would do afterwards.[170]
>
> ***
>
> Information from the observations is included in the [Functional Behavioral Assessment].[171]

72.    District TVI/Assistive Technology Instructional Specialist, Joe Dlugo, assessed the Student's use of assistive technology.[172] As part of the reevaluation, Mr. Dlugo reviewed the Student's records, including her current Functional Vision/Learning Media Assessment, current IEP, and her most recent clinical vision report.[173] Mr. Dlugo observed the Student in the special education environment and interviewed teachers, the Student's SLP, and District assistive technology staff.[174] Mr. Dlugo made multiple assistive technology recommendations for the Student.[175]

73.    In making these recommendations, Mr. Dlugo noted that,

> Although the recommendations provided in this report reflect [the Student]'s current user experience, it is important to consider her future academic expectations and environments as well. Considerations for

---

[168] P11 p58; D6 pp7, 58.

[169] P11 pp59-60; D6 pp59-60.

[170] T375.

[171] T376.

[172] P11 pp61-65; D6 pp61-65.

[173] P11 p61; D6 p61.

[174] P11 pp63-65; D6 pp63-65.

[175] P11 pp63-65; D6 pp63-65.

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2023-SE-0130
Docket No. 07-2023-OSPI-01971
8612 - OSPI
Page 28

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

> assistive technology should include ongoing assessment of her learning media preferences as well as the effectiveness of her current technology devices. Additionally, the use of assistive technology often requires specialized training and knowledge for staff who support [the Student]. It is important that team members are supported with opportunities for continued education to gain, implement, and maintain these skills.[176]

74.    As part of the November 2021 Reevaluation, Ms. Ewing conducted a Functional Behavioral Assessment (FBA) of the Student. It is typical for a school psychologist to conduct an FBA. Ms. Ewing will consult with a behavior specialist if needed.[177] Ms. Ewing considered data gathered by the Student's special education teacher and her occupational therapist.[178] She also considered behaviors reported by the Parent at home and the behavior report provided by BCBA Dy Thompson with Behavior Cusp LLC.[179] The Student demonstrated task refusal through shaking her head no, looking away from an adult when given a task demand, crumpling/ripping paper, knocking items to the ground, not complying with the task demand, taking off her mask, or using her talker to say something unrelated to the task.[180] The target behavior occurred with any school staff, across all school settings, and at any time of day. The behavior occurred less frequently when the Student was working with adults she was familiar with and was doing tasks or activities she preferred.[181]

75.    At the Parent's request, the District reviewed three reports (dated February 22, 2021, September 8, 2021, and October 8, 2021) from Ms. Thompson.[182] These reports discussed a number of behavioral concerns in the home environment. As discussed in the Reevaluation report:

> The data indicated in the report dated 10/8/21 and observed in the home environment does not align with the data collected for reevaluation purposes in the school environment. While [Student] does display some mild task refusal behaviors (shaking head no, looking away, knocking item to the ground, ignoring a task demand) in the

---

[176] P11 p65; D6 p65.

[177] T352.

[178] T378.

[179] D7 pp72-73.

[180] P12 p3; D7 p3.

[181] P12 p3; D7 p3.

[182] P11 pp72-73; D6 pp72-73.

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2023-SE-0130
Docket No. 07-2023-OSPI-01971
8612 - OSPI
Page 29

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

school setting, she is not demonstrating significant task refusal behaviors, aggression, or a lack of response to the first/then model.[183]

76.    The FBA indicated that a behavioral intervention plan (BIP) should not be considered to address the Student's behavior.[184]

77.    Ms. Malek did not believe the Student needed a BIP at HHES.[185]

78.    There is no evidence in the record that the Student's behavior in the school setting required a BIP and no evidence that any District teachers or staff believed Student's behaviors required a BIP.

79.    During the meeting on November 8, 2021, to discuss the Reevaluation, the Parent declined to review the FBA because she did not agree with it. The Parent indicated to the reevaluation team that she intended to request an independent FBA at the District's expense.[186]

80.    During the meeting on November 8, 2021, the Parent and her advocate, Ms. Caldart, expressed concern about orientation/mobility, and vision changing from SDI to related services. They also expressed concern that communication changed from a supplementary aid and service to a related service. The Parent did not agree with these changes.[187]

81.    After meeting on November 8, 2021, the reevaluation team made the following recommendation to the Student's IEP team:

> [The Student] requires intensive specially designed instruction and a small group, special education environment to work on pre-reading skills, pre-writing skills, pre-math skills, functional academic skills, adaptive/life skills, and social/emotional/behavioral skills. [The Student] requires related services in functional communication, fine motor, gross motor, vision, and orientation/ mobility skills as well as

---

[183] P11 pp73; D6 pp73.

[184] P12 p3; D7 p3.

[185] T1158.

[186] P11 p75; D6 p75.

[187] P11 p75; D6 p75.

audiology and communication as supplementary aids and services to support her specially designed instruction.[188]

82.     Each member of the reevaluation team, except the Parent, signed the November 2021 Reevaluation on November 3, November 8, or November 15, 2021.[189] The Parent declined to sign the reevaluation because she disagreed with the team's decision to change communication, vision, and orientation and mobility to a related service .[190]

83.     There is no evidence in the record that the Parent or any other team members raised concerns regarding autism at the reevaluation meeting.

84.     By prior written notice (PWN) dated November 10, 2021, the District proposed:

to continue Student's eligibility for special education services under the category of Multiple Disabilities with specially designed instruction in social/emotional/behavioral, adaptive, reading, writing, and math skills, with related services in vision, fine motor, gross motor, communication, and orientation/mobility, as well as supplementary aids and services and communication and audiology.[191]

85.     By email dated November 24, 2021, the Parent, through her attorney, expressed her disagreement with the November 2021 Reevaluation and requested an IEE at the District's expense.[192] The Parent's attorney raised several concerns in the email, including that the cognitive and academic testing for the November 2021 Reevaluation were not administered by a person trained in or knowledgeable about assessing the needs of a deafblind person and that the school psychologist was not proficient in ASL.[193] The email did not raise concerns about whether the Student was properly assessed for autism.[194]

---

[188] P11 p7; D6 p7.

[189] P11 p9; D6 p9.

[190] P11 p75; D6 p75.

[191] P11 p74; P14.

[192] P32F.

[193] P32F 2.

[194] 32F.

86.    After the Parent requested an IEE at the District's expense on November 24, 2021, the District filed a due process hearing request on December 6, 2021, seeking to defend the appropriateness of the November 2021 Reevaluation.[195]

**IEP Team Meeting**

87.    An IEP team meeting was scheduled for November 29, 2021, to review the Student's current IEP.[196] After the Parent requested that her attorney attend the meeting, the meeting was rescheduled to December 10, 2021.[197]

88.    IEP team members present on December 10, 2021, were Ms. Shepard, Ms. Truitt, Ms. Pelander, Ms. Malek, the Parent, Ms. Chappell, Ms. Donohue, Ms. Comstock, Ms. McCall, Ms. Hinten, Ms. Rodenberg, Ms. Upchurch, Ms. Caldart, and the District's attorney.[198]

89.    At the meeting on December 10, 2021, the IEP team agreed to delay the review of the Student's IEP based on the District's pending due process hearing request.[199] The District continued to implement the October 2020 IEP as the Student's stay put placement.[200] As a result, from December 2020 through June 2022, Student's team worked on the October 2020 IEP goals.[201]

90.    In the IEP team meeting on December 10, 2021, the Parent communicated the following needs of the Student to the team:

- A one-to-one (1:1) intervener trained in dual sensory loss;

- An interpreter who is able to sign alongside the teacher;

- Continued work with Board Certified Behavior Analyst (BCBA) Dy Thompson; and

- ESY services.[202]

---

[195] D21 p5; T1349.

[196] D9.

[197] P32F p3; D17 p18.

[198] P18 p36; D15 p1.

[199] P18 p36; D15 p1.

[200] D21 p5; T94-95, 99, 1169.

[201] T1168; D11.

[202] P32 pp3-5.

91.     Based on evidence in the record, December 10, 2021, is the first time the Parent requested that the District provide an intervener for the Student.

92.     In an email from the Parent to Amy McCall, dated February 4, 2022, the Parent discussed that, in the past, the Student had negative reactions to having devices near her ears. [203]

93.     Since the Student was two and a half years old, the Parent has tried to get the Student accustomed to having things in or near her ears with no success. At one point the Student reacted to her mother's attempts by vomiting and collapsing in a fetal position.[204]

94.     In a February 11, 2022 email from Amy McCall to the Parent, Ms. McCall discussed the benefits and differences between the Soundfield and the FM/DM + Focus amplification systems and encouraged the Parent to try the FM/DM + Focus system:

> The FM/DM + FOCUS differs from the sound field system in that it is easily transportable, so it can be used in all learning environments. Another major difference is that it can be set up so both the teacher and para have a microphone that brings their voice directly to the student's ear, improving her access to them both. This alone could drastically improve her learning experience in the classroom. As you mentioned, the FOCUS is different from a hearing aid in that it doesn't amplify, it just brings the speaker's voice to student's ear, reducing the negative impact of distance and noise. It is also smaller than a hearing aid and is extremely light so it's different from anything tried in the past. The piece that goes in the ear is so tiny it almost can't be felt.

> While there has been resistance to things worn on the ears in the past and it sounds like there still is at home, we don't see this at school. A mask is worn around the ears every day and attempts are even made to put the mask back on if it comes off. This doesn't necessarily mean the FOCUS system is going to be tolerated well, but it may. We won't know unless we try and with it having the potential to make such a positive difference at school I do recommend we try it. I would do so slowly and gently, taking great care for it to be a positive experience. If we were to trial this system, I'd look for improvements such as a reduction in the

---

[203] P19 p3.

[204] T1400-1405.

number of re-directions needed, increased time focused on the learning material, increased amount of productive work completed, increase in the amount of correct responses and reduced fatigue overall.[205]

The Parent did not agree to try the FM/DM + FOCUS system.

95.    In a December 17, 2021 email to the Parent, Ms. Malek described recent behavior exhibited by the Student in the general education setting. Ms. Malek noted that "though this particular behavior was intense and did briefly result in her taking a break from being in the general education setting it is not something that happens frequently."[206]

96.    In a follow-up email on January 19, 2022, Ms. Malek informed the Parent that the behavior exhibited in December was "described as intense because it was significantly different than [the Student's] normal behavior. . . . This was the first 'intense' behavior that [the Student] has engaged in this school year and has not been repeated since."[207]

97.    In response to Ms. Malek's emails, on February 7, 2022, the Parent expressed concerns about the Student being removed from her learning environment due to her behavior.[208]

98.    Diane "Dy" Thompson[209] is a BCBA and is fluent with ASL.[210] She worked with the Student during the 2021-2022 school year in both the home and school settings.[211] Ms. Thompson created an individual treatment plan for the Student.[212] When working with the Student at home, Ms. Thompson found the Student to be more independent, helpful, and well-mannered. At home, the Student appeared more content, predictable, and happy. When the Student returned to school in 2021 after the summer, Ms. Thompson believes the Student regressed and she found the Student to be "incredibly challenging."[213] The Student began acting out at home, throwing tantrums, behaving aggressively, and refusing directions from her parents.[214] Ms.

---

[205] P19 pp1-2.

[206] D17 p15-16.

[207] D17 p14.

[208] D17 p14.

[209] Ms. Thompson has a bachelor's degree in psychology and a master's degree in applied behavior analysis. She worked in the public school system for 30 years. She owns and operates a behavior clinic that she opened in or around 2020.

[210] P29 p1,3.

[211] P29 p1.

[212] P29 p1, P29B.

[213] P29 p2.

[214] T708.

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2023-SE-0130
Docket No. 07-2023-OSPI-01971
8612 - OSPI
Page 34

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

Thompson determined there were no expectations for the Student at school, as opposed to the home setting, where she found the Parent had appropriate expectations for the Student and supported her in meeting those expectations. Ms. Thompson believes the Student was treated in school as if she were helpless. She described District staff prompting Student, Student refusing the prompt, and staff completing the task for the Student.[215] She witnessed school staff speaking to the Student using baby talk and picking the Student up and carrying her on their hip as if she were a toddler.[216] In Ms. Thompson's opinion, as a result of the juxtaposition of no demands at school and appropriate demands at home, the Student regressed in the home setting.[217, 218]

99.    In a February 3, 2022 email from Lynne Truitt to the Parent, Ms. Truitt references an intervener document provided by NCDB.[219]

100.    On January 14, 2022, the Parent filed a due process hearing request because she disagreed with the November Reevaluation, and she believed the District had denied the Student FAPE through a failure to respond to the Student's needs in the area of communication.[220]

101.    In April 2022, the Parent withdrew her request for an IEE at the District's expense.[221] The District and the Parent withdrew their respective due process hearing requests on April 14, 2022.[222]

102.    In April 2022, at the Parent's request, Linda Alsop[223] conducted an informal observation of the Student via Zoom.[224] Ms. Alsop has worked with deafblind students since 1989.[225] Ms. Alsop developed and implemented the first online deafblind

---

[215] P29 pp2-3.

[216] T708-709.

[217] P29 pp2-3.

[218] On July 4, 2022, the Parent paid Ms. Thompson $5,000 for working with the family to increase their ability to communicate in ASL. P29 p3, P29E.

[219] D17 p18.

[220] D21 p5.

[221] T1453-1454.

[222] D17 p36; D21 p6; T1453-1454.

[223] Ms. Alsop has a bachelor's degree in special education and a master's degree in Communicative Disorders – Deaf Education. She is the director and developer of the Utah State University Program of Studies in Deafblindness. P30A

[224] P30 p2.

[225] T477.

Findings of Fact, Conclusions of Law, and Final Order
Cause No. 2023-SE-0130
Docket No. 07-2023-OSPI-01971
8612 - OSPI
Page 35

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA 98504-2489
(800) 845-8830
(206) 587-5135

program in the country that trains interveners to work with children with deafblindness. Ms. Alsop oversees an intervener training program that she developed at Utah State University. It typically takes an intervener one to one and a half years to complete the intervener training.[226]

103.    When conducting an observation of a child that is deafblind, Ms. Alsop's objective is to determine their level of access to the school environment and make recommendations that would allow for increased access if implemented properly.[227]

> So, when we talk about children who are deafblind, their biggest issue is lack of access to the world, their lack of a compensatory sense, which means that neither vision or hearing is strong enough to give them the information they need to function. Then, access becomes the primary question. What access is available? How is it being provided? What needs to be changed to provide access? .[228]

104.    On April 22, 2022, Ms. Alsop conducted a full-day, in-person observation of the Student at school.[229] Ms. Alsop determined that tactile sign language was the most effective form of communication for the Student and she determined that the Student should have been evaluated using her preferred form of communication.[230] Ms. Alsop recommended that the Student be provided with an intervener "to promote and facilitate consistent access to the visual and auditory information necessary for the Student to learn and progress in her educational environment."[231] Ms. Alsop also recommended that the Student's IEP team improve their skills with signing and Braille.[232]

105.    Ms. Alsop did not observe the Student using tactile signing.[233] There is no evidence in the record showing that the Student had training or instruction in tactile signing.

106.    In Ms. Alsop's experience working with deaf or hard of hearing students, most of the students have a ToD or access to a ToD for questions, consultations, or

---

[226] P30 p2; T479-481.

[227] P30 p2.

[228] T487.

[229] P30 p3.

[230] P30 p4; T500-501.

[231] P30 p4.

[232] P30 p5.

[233] T555.

communications help.[234] After her observation of the Student at school, Ms. Alsop believed the Student needed a ToD.[235]

> So, a teacher of the deaf, I believe, would have worked with those teachers and the team to explain, you know, what the student needed in terms of proximity to the teacher and also perhaps an FM system, some way to access what the teacher was saying.[236]

107.    Ms. Alsop did not observe the Student using her AAC device effectively.[237] She only saw the Student use the AAC device when she was prompted by an adult to touch something on the device.[238] Ms. Alsop believes an AAC device, when used properly, is a tool for expressive communication and is less effective for receptive communication.[239]

108.    Ms. Alsop described her observation of the Student during her general education math class:

> Her desk was in the middle, so she was a ways back. All the instruction was verbal. There was a different aid with her who did a lot of hand-over-hand manipulating, which is not best practice. The math concept was an advanced concept, and it was too abstract. So, the aide basically did the math for her, helped her write some things and then wrote some of the things herself. The Student was looking at the other students. She wasn't very engaged with the other students and when they were given time to work by themselves at the end of class, [the Student] would just look around at the students and the aide was completing the assignment for her.[240]

109.    During her observation of the Student, Ms. Alsop only saw sign language used once as a form of communication with the Student. This occurred in the gym for a brief period when she saw a group of other students communicating with the Student using signs they had learned.[241]

---

[234] T496.

[235] T497-498.

[236] T498.

[237] P30 p4.

[238] T519.

[239] P30 p4.

[240] T512-513.

[241] T516-517.

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2023-SE-0130
Docket No. 07-2023-OSPI-01971
8612 - OSPI
Page 37

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

110.    Ms. Alsop determined that the strategies implemented by the District at that time for the Student were ineffective at providing access for her education.

> As I observed throughout the day, she did not do much expressive communication. She had various paraeducators working with her and they basically kind of told her where to go and what to do.
>
> And when it came to the classroom and doing assignments, she didn't really have opportunities to communicate or give an answer or somehow communicate back. And I also didn't see anyone who could tactilely sign with her or even use sign language with her, other than the teacher. We did meet for about fifteen minutes with the SLP in the gym, and she did use sign language with the Student and the Student perked up and loved it. And there were some other students there who tried some tactile signing with the Student and she loved it.
>
> So, as I observed her responding to the experience and as I observed her being very disengaged and, you know, not very connected, not understanding what was going on that is when I made the assumption, or at least observation, that she should have tactile sign language for her testing, for her work in school, you know for all of that.[242]

111.    Ms. Comstock estimates that the Student could sign between 30 and 40 signs by the end of her fifth-grade year.[243] The Student could sign five signs unprompted – car, go, toilet, mom, and walk. The other signs required prompting the Student first.[244]

112.    Ms. Malek believed the Student experienced minimal growth in the general education setting in fifth grade. She made no measurable improvements in general education, as opposed to the 1:1 special education setting where Ms. Malek saw some progress.[245] Ms. Malek noted that, because of the short period of time the Student spent in special education, the Student did not make as much progress as Ms. Malek hoped to see.[246] According to Ms.

---

[242] T501-502.

[243] T125.

[244] D19 p1; T1166.

[245] T1155-1156.

[246] T1155-1156.

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2023-SE-0130
Docket No. 07-2023-OSPI-01971
8612 - OSPI
Page 38

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

Malek, when the Student was doing the same or similar activities in the general education setting, she would get the answers incorrect, or she would not answer period, but in the special education setting, her accuracy did improve from when I started working with her until she finished fifth grade.[247]

113.    Ms. Pelander, one of the Student's general education teachers, was in favor of a reduction in the amount of time the Student spent in general education. "I felt like more special ed support was needed to support the Student because it would have been easier for her to understand and learn more at her instructional level."[248] Ms. Pelander felt there were barriers to the Student accessing academics in the general education setting, such as "being able to read chapter books and textbooks and being able to recall information is important, and we were doing a lot of modifying to make sure that she could be best supported at her instructional level."[249]

**June 2022 IEP**

114.    On May 24, 2022, the Parent requested an IEE at District expense in the area of communication.[250] The District issued a PWN on June 6, 2022, stating that it would not fund an IEE. The District filed a due process hearing request on June 7, 2022, to defend the appropriateness of its communication evaluation.[251] On May 24, 2022, the Parent also requested a 1:1 intervener credentialed, or working to be credentialed, through an institution of higher education with working knowledge of sign language. The Parent also asked the District to communicate with the Student using tactile sign language.[252]

115.    Based on the evidence in the record, May 24, 2022, is the first time the Parent asked the District to communicate with the Student using tactile sign language.

116.    The Student's IEP team met again on May 26, 2022.[253] IEP team members present on May 26, 2022, were Ms. Shepard, Ms. Truitt, Ms. Pelander, Ms. Malek, the Parent, Ms. Chappell, Ms. Donohue, Ms. Comstock, Ms. McCall, Alex Skavlem, Ms. Caldart, Ms. Pellegrini, and Ms. Alsop.[254]

---

[247] T1170.
[248] T281.
[249] T281.
[250] D14 p1.
[251] D14 p1.
[252] P32 p9.
[253] P32 p9; P18 p36.
[254] P18 p36; P22 p36; D15 p1.

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2023-SE-0130
Docket No. 07-2023-OSPI-01971
8612 - OSPI
Page 39

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

117.   According to Ms. Packard, the purpose of an intervener is to provide individualized support to a student who is deaf blind, ... ensuring that they have access to their education, social opportunities, communication, concept development, all the incidental information that is missed because of impacts to vision and hearing.[255]

118.   The National Center on Deafblindness (NCDB) provides the following explanations of why intervener services may be needed for a student who is deafblind and how the need for an intervener may be determined:[256]

> Students who are deafblind have absent, partial, or distorted vision and hearing. Deafblindness severely limits access to visual and auditory information that forms the basis for learning and communication and creates challenges for educational systems mandated to provide a free and appropriate education in the least restrictive environment. Intervener services are a way to meet the challenge of providing students who are deafblind with access to information they are unable to gather via vision and hearing and to support their communication and concept development.
>
> \*\*\*
>
> There are currently no nationally accepted or standardized criteria to determine if a student requires intervener services. The decision is highly individualized based on the needs of a particular student as determined by the student's IEP team.
>
> \*\*\*
>
> To make an informed decision, the team must clearly understand
>
> 1. How the student's deafblindness affects their access to information, communication, social relationships, and conceptual learning. Combined vision and hearing loss typically substantially limits access in each of these areas.
> 2. The supports and accommodations needed by the student to obtain access in those areas.

119.   Ms. Alsop did not include the need for a ToD or an FM system in her recommendations in the observation report that she presented to the IEP team.[257] The Parent recalls that, at the May 26, 2022 IEP Team meeting, Ms. McCall expressed a desire to wait for the input of an intervener before the team determined whether a ToD would be necessary for the Student.[258]

---

[255] T237.

[256] D30 p2.

[257] P30B; T557.

[258] P32 10.

120.    At the May 26, 2022 IEP team meeting, the team determined the Student qualified for ESY services. [259] The record does not show what ESY instruction was offered for the Student. The Parent declined what she believed was a preset program of ESY services and requested that the Student instead work separately with an intervener over the summer.[260]

121.    The District declined that request because it did not view an intervener as part of the Student's skills from the prior year that the Student needed to maintain. Additionally, the District had decided to train an intervener within the District.[261]

122.    The District's ESY services are intended to ensure a student does not lose learned skills over a long break. The purpose is to maintain skills from the prior year, not to learn new skills. [262] The District believed working with an intervener over the summer would qualify as learning new skills because the Student did not previously have an intervener.[263] At the hearing, Ms. Truitt acknowledged that an intervener could work with a student on existing skills.[264]

123.    The December 10, 2021, and May 26, 2022 IEP team meetings resulted in what is referred to herein as the June 2022 IEP,[265] with an effective date of June 7, 2022.[266]

124.    Under the June 2022 IEP, the District agreed to provide the Student with an intervener.[267]

125.    In developing the June 2022 IEP, the IEP team considered the strengths of the Student and the Parent's concerns; the Student's performance on general state or District-wide assessments; the communication needs of the Student; the Student's needs for assistive technology devices and services; and, whether the Student's behavior impedes learning.[268] The District identified the Parent's desire for the Student to be an active member of the general education class and to have maximum access to her general education peers. The District determined that the Student has needs in

---

[259] P32Q p6; T1457.

[260] P32Q p6; T1457.

[261] T1335.

[262] T1354-1355.

[263] T1354-1355.

[264] T1363.

[265] The Parent refers to this IEP in her exhibits as the November 30, 2021 IEP. Because it was finalized in June 2022, the ALJ refers to it as the June 2022 IEP.

[266] P18 pp1-39; D22 pp2-42.

[267] P21 p3.

[268] P18 p5; D22 p8.

the areas of receptive and expressive language and speech. She communicates with an AAC device provided by the Parent, an iPad provided by the District, adapted sign language, and gesturing. The IEP team agreed that the Student's behavior does not impede her learning.[269]

126.    The June 2022 IEP team considered Braille instruction for the Student and determined it was not appropriate at the time.[270]

127.    The IEP team considered the hearing evaluation dated July 20, 2021, performed by Lisa Mancl, which found that the student had a mild hearing loss for both frequency-specific sounds and for speech.[271]

128.    The June 2022 IEP did not provide for the Student to participate in a DHH program, set goals related to hearing, or provide a ToD for the Student.[272]

129.    The June 2022 IEP provided a progress update on the Student's communication goals. The Student had met goals focused on using adapted signs routinely in the classroom and adjusting the volume on her talker. She had made progress toward her goal to extend a conversation and engage in a conversation with two or three turns. She was able to answer "Wh" questions (what, where, who) independently one or two times out of five but had not met her goal to do so four out of five times.[273]

130.    The June 2022 IEP also set three goals for communication, focused on finding frequently used vocabulary words on her talker or signing the word, improving conversation skills, and improving operational use of her talker.[274]

131.    The June 2022 IEP provided two matrixes for the Student's services – one for the end of the 2021-2022 school year and one for the start of the Student's 2022-2023 school year in middle school. The IEP provided the Student with the following services from June 7, 2022, through June 23, 2022:[275]

---

[269] P18 p5; D22 p8.

[270] P18 p6; D22 p9.

[271] P18 p7; D22 p10.

[272] P18; D22.

[273] P18 p17-18; T54-55.

[274] P18 pp23-24.

[275] P18 p31; D22 p34.

**Services 06/07/2022 – 06/23/2022**

| Concurrent | Service(s) | Service Provider for Delivering Service | Monitor | Frequency | Location (setting) | Start Date | End Date |
|---|---|---|---|---|---|---|---|
| **Related** | | | | | | | |
| No | Orientation & Mobility | Orent/Mobility Specialist | Orientation /Mobility Specialist | 30 Minutes / 2 Times Monthly | Special Education | 06/07/2022 | 06/23/2022 |
| No | Communication | Paraeducator | Sp/Lang Path | 20 Minutes / 1 Times Daily | General Education | 06/07/2022 | 06/23/2022 |
| No | Communication | Sp/Lang Path | Sp/Lang Path | 30 Minutes / 3 Times Monthly | General Education | 06/07/2022 | 06/23/2022 |
| No | OT | OT | OT | 45 Minutes / Monthly | General Education | 06/07/2022 | 06/23/2022 |
| No | Communication | Sp/Lang Path | Sp/Lang Path | 30 Minutes / 3 Times Monthly | Special Education | 06/07/2022 | 06/23/2022 |
| No | Gross Motor | PT | PT | 90 Minutes / Monthly | Special Education | 06/07/2022 | 06/23/2022 |
| No | OT | OT | OT | 45 Minutes / Monthly | Special Education | 06/07/2022 | 06/23/2022 |
| No | Vision | Vision Specialist | Vision Specialist | 30 Minutes / Weekly | Special Education | 06/07/2022 | 06/23/2022 |
| **Special Education** | | | | | | | |
| No | Math | Paraeducator | Sp Ed Teacher | 50 Minutes / 5 Times Weekly | General Education | 06/07/2022 | 06/23/2022 |
| No | Adaptive Behavior | Paraeducator | Sp Ed Teacher | 45 Minutes / 5 Times Weekly | Special Education | 06/07/2022 | 06/23/2022 |
| No | Social Emotional/Behavioral | Paraeducator | Sp Ed Teacher | 45 Minutes / 5 Times Weekly | General Education | 06/07/2022 | 06/23/2022 |
| Yes | Reading | Paraeducator | Sp Ed Teacher | 50 Minutes / 5 Times Weekly | General Education | 06/07/2022 | 06/23/2022 |
| Yes | Written Language | Paraeducator | Sp Ed Teacher | 50 Minutes / 5 Times Weekly | General Education | 06/07/2022 | 06/23/2022 |
| No | Adaptive Behavior | Paraeducator | Sp Ed Teacher | 45 Minutes / 5 Times Weekly | Special Education | 06/07/2022 | 06/23/2022 |
| No | Math | Paraeducator | Sp Ed Teacher | 60 Minutes / 5 Times Weekly | General Education | 06/07/2022 | 06/23/2022 |
| No | Reading | Paraeducator | Sp Ed Teacher | 30 Minutes / 5 Times Weekly | General Education | 06/07/2022 | 06/23/2022 |
| No | Written Language | Paraeducator | Sp Ed Teacher | 30 Minutes / 5 Times Weekly | General Education | 06/07/2022 | 06/23/2022 |
| No | Social Emotional/Behavioral | Paraeducator | Sp Ed Teacher | 45 Minutes / 5 Times Weekly | General Education | 06/07/2022 | 06/23/2022 |

| | |
|---|---|
| Total minutes per week student spends in school: | 1740 minutes per week |
| Total minutes per week student is served in a special education setting: | 551.25 minutes per week |
| Percent of time in general education setting: | 68.32% in General Education Setting |

From June 24, 2023, to November 28, 2022, the June 2022 IEP provided for the following services and supplementary aids and services for the Student:[276]

**Services 06/24/2022 – 11/28/2022**

| Concurrent | Service(s) | Service Provider for Delivering Service | Monitor | Frequency | Location (setting) | Start Date | End Date |
|---|---|---|---|---|---|---|---|
| **Related** | | | | | | | |
| No | Communication | Sp/Lang Path | Sp/Lang Path | 30 Minutes / 3 Times Monthly | Special Education | 06/24/2022 | 11/28/2022 |
| No | Gross Motor | PT | PT | 90 Minutes / Monthly | Special Education | 06/24/2022 | 11/28/2022 |

---

[276] P18 p31-33; D22 p34-36.

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2023-SE-0130
Docket No. 07-2023-OSPI-01971
8612 - OSPI
Page 43

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

| No | OT | OT | OT | 45 Minutes / Monthly | Special Education | 06/24/2022 | 11/28/2022 |
|----|----|----|----|----|----|----|----|
| No | Vision | Vision Specialist | Vision Specialist | 30 Minutes / Weekly | Special Education | 06/24/2022 | 11/28/2022 |
| No | Orientation & Mobility | Orent/Mobility Specialist | Orientation /Mobility Specialist | 30 Minutes / 2 Times Monthly | Special Education | 06/24/2022 | 11/28/2022 |
| No | Communication | Paraeducator | Sp/Lang Path | 20 Minutes / 1 Times Daily | General Education | 06/24/2022 | 11/28/2022 |
| No | Communication | Sp/Lang Path | Sp/Lang Path | 30 Minutes / 3 Times Monthly | General Education | 06/24/2022 | 11/28/2022 |
| No | OT | OT | OT | 45 Minutes / Monthly | General Education | 06/24/2022 | 11/28/2022 |

| Special Education | | | | | | | |
|----|----|----|----|----|----|----|----|
| No | Math | Paraeducator | Sp Ed Teacher | 50 Minutes / 5 Times Weekly | General Education | 06/24/2022 | 11/28/2022 |
| No | Adaptive Behavior | Paraeducator | Sp Ed Teacher | 45 Minutes / 5 Times Weekly | Special Education | 06/24/2022 | 11/28/2022 |
| No | Social Emotional/Behavioral | Paraeducator | Sp Ed Teacher | 45 Minutes / 5 Times Weekly | General Education | 06/24/2022 | 11/28/2022 |
| Yes | Reading | Paraeducator | Sp Ed Teacher | 50 Minutes / 5 Times Weekly | General Education | 06/24/2022 | 11/28/2022 |
| Yes | Written Language | Paraeducator | Sp Ed Teacher | 50 Minutes / 5 Times Weekly | General Education | 06/24/2022 | 11/28/2022 |
| No | Adaptive Behavior | Paraeducator | Sp Ed Teacher | 45 Minutes / 5 Times Weekly | Special Education | 06/24/2022 | 11/28/2022 |
| No | Math | Paraeducator | Sp Ed Teacher | 60 Minutes / 5 Times Weekly | General Education | 06/24/2022 | 11/28/2022 |
| No | Reading | Paraeducator | Sp Ed Teacher | 30 Minutes / 5 Times Weekly | General Education | 06/24/2022 | 11/28/2022 |
| No | Written Language | Paraeducator | Sp Ed Teacher | 30 Minutes / 5 Times Weekly | General Education | 06/24/2022 | 11/28/2022 |
| No | Social Emotional/Behavioral | Paraeducator | Sp Ed Teacher | 45 Minutes / 5 Times Weekly | General Education | 06/24/2022 | 11/28/2022 |

Total minutes per week student spends in school:    1740 minutes per week
Total minutes per week student is served in a special education setting: 551.25 minutes per week
Percent of time in general education setting:    68.32% in General Education Setting

**Supplementary Aids and Services:**

| Concurrent | Service(s) | Service Provider for Delivering Service | Monitor | Frequency | Location (setting) | Start Date | End Date |
|----|----|----|----|----|----|----|----|
| No | Orientation & Mobility | Orientation/Mobility Specialist | Orientation /Mobility Specialist | 30 Minutes / 3 Times Yearly | Special Education | 06/07/2022 | 06/23/2022 |
| No | Paraeducator | Intervener | Sp Ed Teacher | 75 Minutes / Daily | Special Education | 06/07/2022 | 06/23/2022 |
| No | Vision | Vision Specialist | Vision Specialist | 15 Minutes / Monthly | Special Education | 06/07/2022 | 06/23/2022 |
| No | Paraeducator | Intervener | Sp Ed Teacher | 273 Minutes / Daily | General Education | 06/07/2022 | 06/23/2022 |
| No | Audiology | Audiologist | Audiologist | 20 Minutes / Monthly | Special Education | 06/07/2022 | 06/23/2022 |
| No | Orientation & Mobility | Orientation/Mobility Specialist | Orientation /Mobility Specialist | 30 Minutes / 3 Times Yearly | Special Education | 06/24/2022 | 11/28/2022 |
| No | Paraeducator | Intervener | Sp Ed Teacher | 75 Minutes / Daily | Special Education | 06/24/2022 | 11/28/2022 |
| No | Vision | Vision Specialist | Vision Specialist | 15 Minutes / Monthly | Special Education | 06/24/2022 | 11/28/2022 |
| No | Paraeducator | Intervener | Sp Ed Teacher | 273 Minutes / Daily | General Education | 06/24/2022 | 11/28/2022 |
| No | Audiology | Audiologist | Audiologist | 20 Minutes / Monthly | Special Education | 06/24/2022 | 11/28/2022 |

132.   The description of services in both matrixes in the June 2022 IEP calls for 68.32% of academic instruction in the general education setting with an intervener to support the Student. The IEP also calls for consultation by the TSVI and the Educational Audiologist with the Student's educational team as a supplementary aid and service.

Findings of Fact, Conclusions of Law, and Final Order
Cause No. 2023-SE-0130
Docket No. 07-2023-OSPI-01971
8612 - OSPI
Page 44

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA 98504-2489
(800) 845-8830
(206) 587-5135

The TSVI consultation could include providing information and training in CVI materials, interventions, schedules, and sensory environments.[277]

133.    The June IEP noted that the Student demonstrated strong student behaviors throughout the majority of the day since returning to school in September 2021. She complied with direction provided by most adults. She used her talker, modified sign language, and pointing to communicate.[278] The Student did not display aggressive behaviors during the school day. The Parent reported that since Fall 2021, the Student frequently threw items and would hit or kick family members at home.[279]

134.    By PWN dated June 7, 2022, the District notified the Parent that it denied her request for an IEE in the area of communication at the District's expense.[280] The District believed that its current communication evaluation was appropriate. The PWN noted that the District agreed to provide a 1:1 intervener to support the Student and would continue to collect data related to the Student's use of various forms of communication with the addition of the 1:1 intervener.[281]

135.    After the Parent made clear that she did not request an IEE, the District withdrew its due process hearing request on June 10, 2022.[282]

136.    By PWN dated June 17, 2022, the District informed the Parent that, over the two IEP TEAM meetings on December 10, 2021, and May 26, 2022, the IEP team added an intervener to the IEP for the 2022-2023 school year and added a second matrix to address the middle school setting.[283]

137.    The Parent requested that the intervener be trained in a higher-level university program and that the intervener be able to engage in tactile signing with the Student.[284] The District agreed to train an intervener at the level necessary to work in a public school setting and determined it would wait for the intervener to begin working

---

[277] P18 p33; D22 p36.

[278] P18 p9; D22 p12.

[279] P18 p10; D22 p13.

[280] P21.

[281] P21 p3.

[282] D21 p6.

[283] P18 p36; P22 p36; D22 p39.

[284] D16.

with the Student before deciding on the need for the intervener to be able to sign and do tactile signing with the Student.[285]

138.    Ms. Alsop understood that the District planned to train the Student's paraeducators using the "Open Hand Open Access" (OHOA) modules.[286]

139.    The OHOA modules are hosted by the Washington DeafBlind Program. The Washington DeafBlind Program is one of three agencies under the umbrella of the Washington Sensory Disability Services (WSDS). The Washington State School for the Blind and the Center for Deaf and Hard of Hearing Youth are also under WSDS.[287]

140.    The OHOA modules target aspects of intervention and strategies that are appropriate for a student with combined impacts to vision and hearing.[288] The modules do not result in a credential or a certification as an intervener but they provide much of the same information that an intervener would learn in a certified program.[289] An intervener for the deafblind is not a codified position in Washington and there are no requirements in Washington that an individual receive a national certification to work as an intervener.[290]

141.    During the periods relevant to this matter, the Washington DeafBlind Program did not have an intervener training program that worked comprehensively with the OHOA program.[291] The Washington DeafBlind Program only offered the OHOA modules for credit.[292] According to Katie Humes, OHOA "is not designed to be a standalone, but it is a starting place and it is what [Washington has] used and many other states have too."[293] Central Michigan University and Utah State University offer comprehensive intervener training programs that award certifications for interveners.[294] Neither intervener certification program includes training in sign language.[295]

---

[285] D16 p.1.

[286] P30 p4.

[287] T216-217.

[288] T189.

[289] T189-190.

[290] T229-230; T335.

[291] T317.

[292] T317.

[293] T317.

[294] T318, 319.

[295] T333.

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2023-SE-0130
Docket No. 07-2023-OSPI-01971
8612 - OSPI
Page 46

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

142.    By email dated July 5, 2022, the Parent inquired whether Ms. Humes could assist her in finding someone who had knowledge in tactile signing or was a credentialed intervener.[296] In response, Ms. Humes provided some resources for the Parent, but noted that

> … I don't know of anyone personally who is looking for a tactile signing intervener position. There are currently four interveners in the state who have the national credential, and three in process. As far as I know, they are all currently under contract in districts.[297]

143.    In the 2021-2022 school year, Ms. Malek completed three of the OHOA directed intervener modules.[298] She continued to review some of the modules independently, explaining, "I have not accessed all of the modules. I look at what pertains to my role as the classroom teacher and what I can share to support paraeducators in the program."[299] Ms. Malek did not train staff directly on what she learned from the modules, but she used them as a tool in her paraeducator meetings to share what she learned and support them in their practices of working with students who have dual sensory losses.[300] From February 2022 until the end of the school year, Ms. Malek believes that she provided feedback to the Student's paraeducators on five modules.[301]

**The 2022-2023 School Year**

144.    In Spring 2022, the staff at Goodman began working with the Parent and with the Student's Team at HHES to ensure Goodman was ready for the Student when she began sixth grade in the Fall.[302] Over Summer 2022, the Parent exchanged emails with staff at Goodman and at HHES, in an attempt to ensure the Student's IEP was ready to be implemented at Goodman.[303]

---

[296] P32R p1.

[297] P32R p2.

[298] T416, T442.

[299] T443, 444.

[300] T444.

[301] T445.

[302] T960.

[303] D17 pp49-61.

Findings of Fact, Conclusions of Law, and Final Order
Cause No. 2023-SE-0130
Docket No. 07-2023-OSPI-01971
8612 - OSPI
Page 47

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA 98504-2489
(800) 845-8830
(206) 587-5135

145.   On August 5, 2022, Dawn Musgrove,[304] assistant principal at Goodman, informed the Parent that two paraeducators at Goodman were planning to start intervener training.[305] Both paraeducators had experience working with nonverbal students who use AAC devices, and one had a deaf sibling and had experience working with deaf students.[306]

146.   By email on August 19, Ms. Musgrove confirmed with the Parent that the two paraeducators were completing the intervener training through the NCDB.[307]

147.   By email sent on or around August 21, 2022, the Parent informed the District that she planned to place the Student outside the District, at St. Nick's, to attend the sixth grade.[308] The Parent requested reimbursement for the private placement.[309]

148.   In a PWN dated August 26, 2022, the District stated that it believed it offered the Student FAPE through her current IEP; therefore, it refused to fund the Parent's unilateral private placement of the Student.[310]

149.   The Parent unilaterally placed the Student at St. Nick's because she did not believe the paraeducators the District intended to train would be adequate interveners for the Student, in large part because they did not know sign language and would not receive the intervener credential training.[311]

150.   The Parent chose St. Nick's as the alternate placement for the Student because the school allowed her to have an intervener (which the Parent financed) and because one of the Student's siblings also attended St. Nick's.[312]

151.   The Parent paid $4,600 to St. Nick's for the Student's tuition.[313]

---

[304] Ms. Musgrove has been the assistant principal at Goodman Middle School in the District for ten years. She has worked in public education for 23 years. She has master's degrees in education and administration. T958-959.

[305] P32T p1; P32X p2; T963, 964

[306] T966.

[307] D17 p60.

[308] P32Y; D20 p.1

[309] P32Y.

[310] P32Z; D20.

[311] P32X; T1416-1418.

[312] T1477-1478.

[313] P32AAA p1; T1439.

152.    In August 2022, the Parent hired Jennifer Pellegrini[314] to serve as the Student's intervener while the Student attended St. Nick's.[315] Ms. Pellegrini completed the remote Utah State University Intervener Training Program and is a credentialed intervener for the deafblind.[316] She completed the intervener training simultaneously while working with the Student at St. Nick's and received her intervener credential in January 2024.[317] Ms. Alsop coached Ms. Pellegrini and oversaw her intervener training through Utah State University, including an in-person observation in February 2023.[318] Ms. Pellegrini has also completed the 40-hour training required for a Registered Behavior Technician (RBT).[319] Before completing the intervener training, Ms. Pellegrini had a limited knowledge of ASL.[320] She knew more than 25 ASL signs, but less than 50 when she began working with the Student. At this time, she does not consider herself fluent with ASL.[321]

153.    At St. Nick's, the Student attended all general education classes, except Spanish. During Spanish class, the Student and her intervener would go to the lunchroom or other common area and would work on ASL and tactile signing.[322] The Student did not attend any special education classes at St. Nick's.[323] The Student was not instructed by a ToD, a TVI, or a TSVI at St. Nick's and the curriculum and materials were not modified by a ToD, a TVI, or a TSVI.[324]

154.    Ms. Pellegrini worked directly one-on-one with the Student each day at St. Nick's. She supported the teachers at St. Nick's, but she did not work under the direction of a teacher or other individual at St. Nick's.[325]

---

[314] Ms. Pellegrini has a bachelor's degree. She is a certified intervener through the Utah State University Intervener training program and has a National Intervener Credential as an Intervener Specialist for the Deafblind. P28A p2.

[315] P28 p1; T1281.

[316] P28 p1.

[317] T1247, 1279-1280.

[318] T483; T1282, 1284.

[319] P28 p3.

[320] P28 p2.

[321] T1286-1287.

[322] T1299.

[323] T1300.

[324] T1300, 1321.

[325] T551; T1293-1294.

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2023-SE-0130
Docket No. 07-2023-OSPI-01971
8612 - OSPI
Page 49

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

155.   When Ms. Pellegrini began working with the Student, she believed the Student had an independent expressive language vocabulary of four or five ASL signs.[326] By the end of the 2022-2023 school year, the Student could independently express approximately 39 ASL or modified ASL signs.[327] Ms. Pellegrini believes the progress she witnessed in the Student during the 2022-2023 school year hinged on Ms. Pellegrini's training through the National Intervener Training Program.[328] She describes the change she witnessed in the Student as

> the Student moving from a world of isolation where she was a puppet, performing for adults, to a world in which she belongs and where she is a whole child craving connection and participation while also learning and growing.[329]

156.   The Parent paid Ms. Pellegrini a total of $22,448.96 for services she provided as an intervener for the Student.[330] The Parent also loaned Ms. Pellegrini a vehicle owned by the Parent. Ms. Pellegrini used the vehicle to travel to and from her home and the Student's school. Ms. Pellegrini paid for her own gasoline when she used the vehicle, and the Parent covered the cost of her tolls.[331]

157.   The Parent paid $5,832.53 in car payments, $699.76 for car insurance, and $1,183.00 in tolls during the time Ms. Pellegrini used the Parent's vehicle.[332]

158.   On February 21, 2023, Ms. Alsop observed the Student in-person at St. Nick's while the Student was supported by Ms. Pellegrini (her intervener).[333] Ms. Alsop found the program at St. Nick's to be more accessible for the Student. She observed the Student engaged in academic and social activities using tactile sign language with her intervener. She found the Student to be less engaged during some of the academic subjects.[334]

---

[326] P28 p3; T1246-1247.

[327] P28 p3.

[328] P28 p4.

[329] P28 p4.

[330] P28 p2, P28B.

[331] P28 p2.

[332] P32AAA p2.

[333] P30 p6.

[334] P30 p6.

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2023-SE-0130
Docket No. 07-2023-OSPI-01971
8612 - OSPI
Page 50

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

159.   Ms. Alsop determined that the Student substantially improved her receptive communication and also increased her output for expressive communication during her year at St. Nick's.[335]

160.   Ms. Alsop does not charge parents for the services she provides.[336] If she had charged for services provided to the Parent between April 8, 2022, and February 22, 2023, the cost would have been $5,000.[337] The Parent paid $2,440.79 for Ms. Alsop's travel and lodging expenses incurred during her in-person visits.[338]

161.   On May 18, 2023, Dr. Jaime Wilson[339] conducted a comprehensive neuropsychological evaluation of the Student.[340] Dr. Wilson estimates that the Student's neuropsychological exam took 30 hours to complete.[341]

162.   Dr. Wilson met the Student more than 18 months after the November Reevaluation and more than a year after the drafting of the June 2022 IEP.

163.   As part of the neuropsychological evaluation, Dr. Wilson met with the Parent, reviewed the Student's medical history, performed a clinical interview, a mental status exam/behavioral observations, and administered and reviewed a "selected battery of neuropsychological tests and standardized behavior rating questionnaires."[342]

164.   Dr. Wilson found the Student had a short attention span and stamina and that her receptive communication appeared to be limited. He determined the Student did best with SimCom[343] tactile signing for receptive communication and straight tactile or simple ASL for expressive communication.[344] Dr. Wilson understood tactile signing to be her preferred method of communication, because when he used ASL with the

---

[335] P30 p6.

[336] T491.

[337] P30 p6, P30D.

[338] P32AAA p1, 3-19, 22; T1440-1441.

[339] Dr. Wilson is a board-certified neuropsychologist. He has conducted over 1,000 neuropsychological exams with deaf, hard of hearing, deafblind, and blind individuals. Between 50 and 100 of those exams have been with deafblind individuals.

[340] P31 p2.

[341] T1081.

[342] P31B p4.

[343] SimCom (Simultaneous Communication) occurs when a speaker uses her voice and signs, either tactilely or with regular ASL, at the same time. T506.

[344] P31 p2.

Findings of Fact, Conclusions of Law, and Final Order
Cause No. 2023-SE-0130
Docket No. 07-2023-OSPI-01971
8612 - OSPI
Page 51

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA 98504-2489
(800) 845-8830
(206) 587-5135

Student upon meeting her, she approached him, reached out her hands, and placed her hands on top of his hands.[345]

165.    Dr. Wilson determined the Student performed in the extremely low range in expressive and receptive language skills and her general communication skills.[346] Dr. Wilson's exam showed the Student exhibited at least a mild level of intellectual disability. She struggled with the functions of attention and concentration. The Student struggled with moving freely from one situation to another, transitions, changing focus from one mindset to another, emotional control, and getting started on tasks or chores.[347] Compared to same-age peers, Dr. Wilson found the Student's reading comprehension results were in the extremely low range, as were her writing and arithmetic skills.[348]

166.    Dr. Wilson's autism spectrum examination indicated that the Student falls within the extremely high range for autism spectrum disorder-related symptoms.[349] Dr. Wilson did not discuss any sensory issues experienced by the Student in his discussion of autism.[350]

167.    Dr. Wilson believes the Student's BASC-3 test results should have resulted in a referral by the District for further testing for autism.[351]

168.    Dr. Wilson used the Social Responsiveness Scale, Second Edition (SRS-2) rating scale to rate the Student for autism.[352] His report notes that he administered "specific Autism Spectrum Disorder (ASD) instruments" as part of his assessment.[353] However, the Appendix to Dr. Wilson's report lists only the SRS-2 under the Autism Spectrum Examination.[354] Dr. Wilson explained that he used achievement testing, behavioral testing and behavioral observations to assess the Student for autism. He also

---

[345] T1034.

[346] P31 pp2-3.

[347] P31 p3.

[348] P31 p4.

[349] P31 p4.

[350] P31B p7.

[351] T1054.

[352] T1194-1195.

[353] P31B p10.

[354] P31B p17.

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2023-SE-0130
Docket No. 07-2023-OSPI-01971
8612 - OSPI
Page 52

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

considered "other data" and the "overall result" of his communication with the Student when making his autism diagnosis.[355]

169.    Dr. Wilson diagnosed the Student with the following after his examination:

- Neurodevelopmental Disorder Associated with HUWE1 Chromosomal Presentation;

- Perinatal Complications including Post-Term (42 weeks' gestation) and Apnea Symptoms;

- Autism Spectrum Disorder Traits with Accompanying Mild Intellectual Disability;

- Attention Deficit / Hyperactivity Disorder – Inattentive Type;

- Bilateral Sensorineural Hearing Loss;

- Cortical Visual Impairment / Blindness / Low Vision;

- Pigmentary Retinal Dystrophy; and

- Hypotonia.[356]

170.    After his examination of the Student, Dr. Wilson recommended that any and all services provided to the Student should be provided via tactile ASL using a tactile signing intervener and that a sign-fluent TVI and a ToD provide 1:1 services.[357] Dr. Wilson did not specifically recommend in his report that the Student participate in a DHH program for her education.[358] Dr. Wilson did not specifically recommend services for autism for the Student. He notes that "all of the recommendations [he has] here would include someone that is on the autism spectrum."[359]

171.    Dr. Wilson believes the November 2021 Reevaluation is not appropriate. At hearing, he noted that "[i]t would be nearly impossible for a school psychologist to evaluate Student and obtain valid scores without appropriate training on administering evaluative tools to students that are deafblind and substantial experience evaluating this community."[360]

---

[355] T1195-1196.

[356] P31 pp4-5; P31B p11.

[357] P31 pp4-5; P31B p12.

[358] P31B; T1206-1207

[359] P31B; T1199.

[360] P31 pp6-7.

172.    There is no evidence in the record that the Parent, her advocates, or District teachers or staff raised concerns prior to Dr. Wilson's autism diagnoses about the Student possibly being on the autism spectrum.[361]

### The 2023-2024 School Year

173.    By email dated August 21, 2023, the Parent informed the District that she reenrolled the Student at Goodman for the 2023-2024 school year. The email included a copy of Dr. Wilson's report. The Parent requested that the District reevaluate the Student through a file review, including Dr. Wilson's report.[362]

174.    The Parent brought the Student to Goodman a few times to meet the special education teacher, Kari Hyatt,[363] and the paraeducators. The Parent noted that none of the staff appeared to know sign language.[364]

175.    By PWN dated August 22, 2023, the District proposed continuing the Student's June 2022 IEP until the IEP team could meet at the beginning of the school year.[365] The District rejected having an IEP team meeting prior to the start of the school year because the District wanted all members of the IEP team to be available and to have had an opportunity to meet and work with the Student prior to the meeting.[366] The District proposed to complete a reevaluation of the Student about four to six weeks into the school year so the team had time to work with the Student and collaborate with the Parent. The District also wanted to consider information requested from St. Nick's, Jennifer Pellegrini, and Dr. Wilson.[367]

176.    The Student's IEP team met on September 6, 2023. The team discussed updates on the Student's academics and supports at St. Nick's, information about the Student's intervener services at St. Nick's, services to be provided at Goodman, a meeting date to write a new IEP, and the Parent's request for a reevaluation.[368] Present at the September 6, 2023 meeting were the Parent, Ms. Musgrove, Ms. Hyatt, Special

---

[361] T1165.

[362] D22 p1.

[363] Ms. Hyatt has a teaching degree in special education and elementary education. She has a master's degree in teaching other languages. She has worked in public and private schools in special education and has worked for the District for four years in the Options program at Goodman. T770-771.

[364] T1423-1424.

[365] P24 p1; D22 p2.

[366] P24 p1; D22 p2.

[367] T1124-25, 1126

[368] D23 p1-6.

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2023-SE-0130
Docket No. 07-2023-OSPI-01971
8612 - OSPI
Page 54

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

Education Teacher/Case Manager, Melissa Guttormsen, General Education Science Teacher, Gabriela Lewis, SLP, Amy McCall, Audiologist, Loren Amici, OT,[369] Ms. Daugherty,[370] TVI, Matthew Collins, Michele Donihue, PT, Julie Rodenberg, Assistive Technology, Elizabeth Shanshala, School Psychologist, Janna Rush,[371] District Director of Special Education, Rachel Olsen, Secondary Special Education Coordinator, the Parent's Attorney, Dr. Wilson, and the District's Attorney.[372]

177.    Dr. Wilson attended the meeting on September 6, 2023, and shared his findings with the IEP team.[373] Dr. Wilson does not recall if he recommended to the IEP team that the Student participate in a DHH program.[374]

178.    By PWN dated September 7, 2023, the District proposed holding an IEP team meeting approximately three weeks after the Student's start at Goodman and continuing the Student's June 2022 IEP until that time. The IEP team rejected providing the Student with a staff member who can tactile sign because

> staff are being trained as interveners to support [the Student] as part of the IEP finalized in June 2022. Additionally, the [Goodman members of the] IEP Team and [the Student]'s related service providers need an opportunity to work directly with [the Student] to gain a better understanding of her current functional, academic and communication needs in the school setting before determining whether or not someone with tactile signing skills is needed as part of [the Student]'s educational program.[375]

---

[369] Ms. Amici has been an OT for twelve years and has worked for the District for five years. She has a master's degree in occupational therapy.

[370] Ms. Daugherty has a master's degree in education, certification as a teacher for students with visual impairments (TSVI), and a Unified English Braille certification. She has worked as a TSVI for two years. Prior to that, since 2012, she was a special education teacher. From 2007 to 2012 she taught elementary school.

[371] Ms. Rush has a bachelor's degree in elementary education and special education and a master's degree in education. She has a principal and an administrative certification. She has taught special education and general education at the elementary and middle school levels. She has served as principal in elementary and middle schools. She is currently the Director of Special Education for the District. T1109-1110.

[372] D23 p6.

[373] P31 p5.

[374] T1211.

[375] D23 p6.

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2023-SE-0130
Docket No. 07-2023-OSPI-01971
8612 - OSPI
Page 55

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

179.    According to the PWN, the IEP team proposed completing a reevaluation four to six weeks after the start of the school year, so teacher and staff would have an opportunity to work with the Student, collaborate with the Parent, and seek more information.[376]

180.    The September 7, 2023 PWN noted that the Parent reported to the IEP team that the Student had not used her AAC device at St. Nick's and had not been using it at home.[377]

181.    The Student began attending Goodman for her seventh-grade year on September 25, 2023.[378]

182.    By email dated September 25, 2023, the Parent provided the District with a list of at least 75 signs the Student knew as of that date.[379]

183.    Staff at Goodman believed they were well prepared for the Student to attend Goodman in Fall 2023.[380]

184.    When the Student started at Goodman, students in the Options Program worked on learning some sign language by watching instructional videos.[381] At Goodman, the Student had at least three paraeducators working with her. All three of the Student's paraeducators were taking the OHOA intervener modules.[382] At the time the Student attended Goodman, none of the paraeducators were fluent in sign language.[383] When the Student arrived at Goodman, she knew limited sign language and would form signs one at a time.[384] The Parent advised Goodman's special education staff not to use the AAC device with the Student because she would "throw it across the room."[385]

185.    The Student had three paraeducators at Goodman, Ms. Ficca, Ms. Crum, and Ms. Crowder. Ms. Ficca completed one module of the intervener training and part of

---

[376] D23 p7.

[377] D23 p6.

[378] D24 p3.

[379] P32 p12; P32BB.

[380] T978.

[381] T776.

[382] T780.

[383] T782-783.

[384] T796.

[385] T797.

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2023-SE-0130
Docket No. 07-2023-OSPI-01971
8612 - OSPI
Page 56

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

another;[386] Ms. Crum believes she made it through the first and second module;[387] and Ms. Crowder completed the first module of the intervener training.[388]

186.    In Fall 2023, the Parent did not know of an available, credentialed intervener.[389]

187.    The District scheduled a visit from Ms. Packard with the Washington DeafBlind Program, to take place on September 28, 2023.[390] As a deafblind intervener coach, Ms. Packard was to provide "on-the-job intervener training" to support the District's intervener training for the Student.[391]

188.    After her visit with the Student on September 28, 2023, Ms. Packard provided an observation report.[392] Ms. Packard described the impact of a combined hearing loss and visual impairment as follows:

> Hearing and vision are distance senses that allow us to gather information. When vision is impacted, the reliance on hearing to collect information is increased. However, when hearing is also not a reliable source of meaningful information, social opportunities, communication, and environmental cues can be missed. **A child whose hearing and vision adversely affect her ability to access the learning environment can be considered "deafblind.**"[393]

> (Emphasis in the original.)

189.    Ms. Packard recommended that the Student's team continue taking the OHOA modules through the Washington DeafBlind Program.[394] In Ms. Packard's experience, a paraeducator for a deafblind student becomes a sort of intervener. "I think that has always been my experience as it has moved as someone from an educator position to recognize more as an intervener."[395]

---

[386] T834

[387] T8854-855.

[388] T867.

[389] T1460.

[390] P32CC pp1-3; D24 p1-6.

[391] D24 p3-4.

[392] D26.

[393] D26 p2.

[394] D26 p3.

[395] T213.

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2023-SE-0130
Docket No. 07-2023-OSPI-01971
8612 - OSPI
Page 57

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

190.    On October 5, 2023, Dr. Wilson observed the Student in-person at Goodman.[396] After his observation, Dr. Wilson recommended a thorough assessment of the Student as well as introduction of appropriate support and communication strategies to facilitate the Student's active participation at school.[397] Consistent with his May 18, 2023 neuropsychological evaluation, Dr. Wilson continued to recommend a tactile interpreter and a 1:1 model to improve the Student's communication.[398]

191.    In the period May 18, 2023, through October 2, 2023, the Parent made three payments to Dr. Wilson, totaling $7,200.[399] This includes a $3,200 payment for the neuropsychological evaluation and two $2,000 retainers for "legal advocacy work."[400] The Parent paid Dr. Wilson an additional $2,000 retainer for his time appearing as a witness at this hearing.[401]

192.    On October 23, 2023, the Parent provided a copy of Dr. Wilson's observation report to the IEP team.[402]

193.    The Student's IEP team met on November 1, 2023, to review her current IEP, discuss annual goal progress, review instructional needs, and consider the Student's placement.[403] The meeting on November 1, 2023, resulted in the November 2023 Draft IEP.[404]

194.    In the November 2023 Draft IEP, the Student's general education Science, Social Studies, and Language Arts teachers recommended that the Student receive instruction in these subjects in the Options program, rather than in the general education setting.[405] Joel Eilers,[406] her Language Arts and Social Studies teacher, wrote,

---

[396] P31 p5; P31C; P32GG.

[397] P31D p5.

[398] P31D p6.

[399] P31D.

[400] P31D.

[401] T1438

[402] P32KK.

[403] D27 p1.

[404] D27.

[405] D27 Pp8-9.

[406] Mr. Eilers earned a bachelor's degree in social work and has a general education teaching credential. He has a master's degree in education. He has worked in a program with at-risk youth and as an after school and summer camp counselor. He taught fourth grade in the Kent school district and middle school in the Seattle school district. He currently teaches seventh grade in the District. T13-814.

I believe that in the Options program [the Student] would be able to continue her learning in an environment with more readily available resources, and even more importantly, in community and collaboration with other students who are receiving accommodations at specific more intensive levels. The shared learning experience, available in the Options program, teaches valuable skills along with providing feelings of inclusion and ownership that are simply not available, to the same level, in her current classes which I teach.[407]

195.    Mr. Eilers did not directly instruct the Student when she was in his classroom. He would meet with the Student's paraeducator a few minutes before each class, and they would agree on some of the words that the Student would focus on learning that day.[408]

196.    Mr. Eilers noted that the interaction between the Student and the general education students in his class was "limited and almost nonexistent."[409]

197.    The November 2023 Draft IEP provided for the following services for the Student from November 5, 2023, through November 3, 2024:[410]

| Concurrent | Service(s) | Service Provider for Delivering Service | Monitor | Frequency | Location (setting) | Start Date | End Date |
|---|---|---|---|---|---|---|---|
| **Related** | | | | | | | |
| No | Vision | Paraeducator | Vision Teacher | 30 Minutes / 3 Times Weekly | Special Education | 11/05/2023 | 11/03/2024 |
| No | Communication | Sp/Lang Path | Sp/Lang Path | 30 Minutes / 3 Times Monthly | Special Education | 11/05/2023 | 11/03/2024 |
| No | Gross Motor | PT | PT | 60 Minutes / Monthly | Special Education | 11/05/2023 | 11/03/2024 |
| No | OT | OT | OT | 90 Minutes / Monthly | Special Education | 11/05/2023 | 11/03/2024 |
| No | Vision | Vision Teacher | Vision Teacher | 45 Minutes / 2 Times Weekly | Special Education | 11/05/2023 | 11/03/2024 |
| No | Orientation & Mobility | Orent/Mobility Specialist | Orientation /Mobility Specialist | 30 Minutes / 2 Times Monthly | Special Education | 11/05/2023 | 11/03/2024 |
| No | Communication | Paraeducator | Sp/Lang Path | 20 Minutes / 1 Times Daily | General Education | 11/05/2023 | 11/03/2024 |

---

[407] D27 p9.

[408] T815-816.

[409] T821.

[410] D27 pp36-37; P26 pp36-37.

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2023-SE-0130
Docket No. 07-2023-OSPI-01971
8612 - OSPI
Page 59

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

| | | | Special Education | | | | |
|---|---|---|---|---|---|---|---|
| No | Adaptive Behavior | Paraeducator | Special Education Teacher | 30 Minutes / 5 Times Weekly | Special Education | 11/05/2023 | 11/03/2024 |
| No | Reading | Paraeducator | Special Education Teacher | 45 Minutes / 5 Times Weekly | Special Education | 11/05/2023 | 11/03/2024 |
| No | Written Language | Paraeducator | Sp Ed Teacher | 30 Minutes / 5 Times Weekly | Special Education | 11/05/2023 | 11/03/2024 |
| No | Social Emotional/Behavioral | Paraeducator | Special Education Teacher | 45 Minutes / 5 Times Weekly | Special Education | 11/05/2023 | 11/03/2024 |
| No | Math | Paraeducator | Sp Ed Teacher | 30 Minutes / 5 Times Weekly | Special Education | 11/05/2023 | 11/03/2024 |
| No | Adaptive Behavior | Paraeducator | Sp Ed Teacher | 30 Minutes / 5 Times Weekly | General Education | 11/05/2023 | 11/03/2024 |
| No | Social Emotional/Behavioral | Paraeducator | Sp Ed Teacher | 30 Minutes / 5 Times Weekly | General Education | 11/05/2023 | 11/03/2024 |
| Yes | Reading | Paraeducator | Sp Ed Teacher | 30 Minutes / 5 Times Weekly | General Education | 11/05/2023 | 11/03/2024 |
| Yes | Written Language | Paraeducator | Sp Ed Teacher | 30 Minutes / 5 Times Weekly | General Education | 11/05/2023 | 11/03/2024 |

**Total minutes per week of building instructional time available for this student (excluding lunch):** 1740 minutes per week

**Total minutes per week student is served in a special education setting:** 1155 minutes per week

**Percent of time in general education setting:** 33.62% in General Education Setting

**Supplementary Aids and Services:**

| Concurrent | Service(s) | Service Provider for Delivering Service | Monitor | Frequency | Location (setting) | Start Date | End Date |
|---|---|---|---|---|---|---|---|
| No | Paraeducator | Intervener | Sp Ed Teacher | 75 Minutes / Daily | Special Education | 11/05/2023 | 11/03/2024 |
| No | Paraeducator | Intervener | Special Education Teacher | 195 Minutes / 1 Times Daily | Special Education | 11/05/2023 | 11/03/2024 |
| No | Paraeducator | Intervener | Special Education Teacher | 210 Minutes / 4 Times Weekly | General Education | 11/05/2023 | 11/03/2024 |
| No | Vision | Vision Teacher | Vision Teacher | 45 Minutes / Weekly | Special Education | 11/05/2023 | 11/03/2024 |
| No | Paraeducator | Intervener | Sp Ed Teacher | 273 Minutes / Daily | General Education | 11/05/2023 | 11/03/2024 |
| No | Audiology | Audiologist | Audiologist | 30 Minutes / Quarterly | Special Education | 11/05/2023 | 11/03/2024 |
| No | Orientation & Mobility | Orientation/Mobility Specialist | Orientation /Mobility Specialist | 30 Minutes / 3 Times Yearly | Special Education | 11/05/2023 | 11/03/2024 |

198.    The November 2023 Draft IEP reduced the amount of time the Student would spend in the general education setting to 33.62%.[411]

199.    The November 2023 Draft IEP noted that the Student would receive her academic instruction in the general education setting with an intervener to support her. It also called for related services two times per week by a TSVI, consisting of 30 minutes of direct service and 15 minutes of training and consultation with the paraeducator supporting vision services.[412]

---

[411] D27 p36; P26 p36.

[412] D27 p37.

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2023-SE-0130
Docket No. 07-2023-OSPI-01971
8612 - OSPI
Page 60

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

**Transfer to the Tacoma School District**

200.    On November 7, 2023, the District processed a Choice Transfer Request form on which the Parent requested that the Student be transferred from Goodman in the District to Baker in the Tacoma School District to participate in the DHH Program.[413] The Student was approved to start Baker on November 16, 2023.[414]

201.    The Tacoma School District's DHH program

> is specialized and grounded on research based best practices in bilingual education for deaf and hard of hearing children. They have access to language through sign language, with all of the supports provided [by specialists].[415]

202.    There are 13 students in the Tacoma DHH program and about 750 students in Baker overall.[416] Every staff member in the DHH program uses tactile signing.[417]

203.    Because the Parent initiated the transfer to the Tacoma school district via a Choice Transfer Request, the Parent was responsible for the transportation costs associated with the Student attending Baker.[418] Under a Choice Transfer Request, the District was not responsible for funding the Student's education at Baker.[419]

204.    If the Student had transferred to Baker under a cooperative agreement between the Tacoma School District and the District, the District would be billed by Tacoma for the cost of providing services to the Student, the District would be responsible for the cost of transportation, and the District would have a representative at the Student's IEP team meetings.[420]

---

[413] P32NN; D28 p3.

[414] D29 p1.

[415] T614.

[416] T651.

[417] T652.

[418] T1232.

[419] T1233.

[420] T1229-1234.

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2023-SE-0130
Docket No. 07-2023-OSPI-01971
8612 - OSPI
Page 61

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

205.    The IEP team did not discuss a cooperative agreement as an alternative to a Choice Transfer because the Parent told the IEP team that she had already submitted the Choice Transfer Request.[421]

206.    On November 20, 2023, the Tacoma School District issued a PWN stating that it had received a copy of the November 2023 draft IEP from the District, which it had used to finalize an IEP for the Student.[422] Changes to the November 2023 draft IEP included adjustments to the Student's service minutes to reflect class period times at Baker and to reflect her placement in the DHH program, and some changes to goals based on data collected during her first few days in the DHH program.[423] The November 2023 IEP implemented at Baker provided for the following services for the Student from November 27, 2023, to November 25, 2024:[424]

### Services 11/27/2023 - 11/25/2024

| Concurrent | Service(s) | Service Provider for Delivering Service | Monitor | Frequency | Location (setting) | Start Date | End Date |
|---|---|---|---|---|---|---|---|
| **Related** | | | | | | | |
| No | Occupational Therapy | OT / COTA | Occupational Therapist | 90 Minutes / 1 Times Monthly | Special Education | 11/27/2023 | 11/25/2024 |
| No | Vision | Education Support Professional | Vision Teacher | 30 Minutes / 3 Times Weekly | Special Education | 11/27/2023 | 11/25/2024 |
| No | Orientation & Mobility | Orientation & Mobility Specialist | Orientation and Mobility Specialist | 30 Minutes / 1 Times Monthly | Special Education | 11/27/2023 | 11/25/2024 |
| No | Speech/ Language | SLP / SLPA | Speech Language Pathologist | 60 Minutes / 1 Times Monthly | Special Education | 11/27/2023 | 11/25/2024 |
| No | Physical Therapy | PT / PTA | Physical Therapist | 30 Minutes / 1 Times Monthly | General Education | 11/27/2023 | 11/25/2024 |
| **Special Education** | | | | | | | |
| No | Vision | Vision Teacher | Vision Teacher | 30 Minutes / 2 Times Weekly | Special Education | 11/27/2023 | 11/25/2024 |
| No | Adaptive/Self Help | Teacher of the Deaf | Teacher of the Deaf | 38 Minutes / 5 Times Weekly | Special Education | 11/27/2023 | 11/25/2024 |
| No | Math | Teacher of the Deaf | Teacher of the Deaf | 35 Minutes / 5 Times Weekly | Special Education | 11/27/2023 | 11/25/2024 |
| No | Reading | Teacher of the Deaf | Teacher of the Deaf | 45 Minutes / 5 Times Weekly | Special Education | 11/27/2023 | 11/25/2024 |
| No | Written Expression | Teacher of the Deaf | Teacher of the Deaf | 35 Minutes / 5 Times Weekly | Special Education | 11/27/2023 | 11/25/2024 |
| No | Social Emotional /Behavioral | Teacher of the Deaf | Teacher of the Deaf | 45 Minutes / 5 Times Weekly | Special Education | 11/27/2023 | 11/25/2024 |

Total minutes per week of building instructional time available for this student (excluding lunch): 1740 minutes per week
Total minutes per week student is served in a special education setting: 1185 minutes per week
Percent of time in general education setting: 31.9% in General Education Setting

### Supplementary Aids and Services:

| Concurrent | Service(s) | Service Provider for Delivering Service | Monitor | Frequency | Location (setting) | Start Date | End Date |
|---|---|---|---|---|---|---|---|
| No | Vision | Vision Teacher | Vision Teacher | 45 Minutes / 1 Times Weekly | Special Education | 11/27/2023 | 11/25/2024 |
| No | Additional Adult Support | Education Support Professional | Teacher of the Deaf | 270 Minutes / 5 Times Weekly | Special Education | 11/27/2023 | 11/25/2024 |
| No | Additional Adult Support | Education Support Professional | Teacher of the Deaf | 120 Minutes / 5 Times Weekly | General Education | 11/27/2023 | 11/25/2024 |
| No | Sign Language Interpreter | Sign Language Interpreter | Teacher of the Deaf | 52 Minutes / 1 Times Daily | General Education | 11/27/2023 | 11/25/2024 |

---

[421] T1230.

[422] P32QQ p39.

[423] P32QQ p39.

[424] P32QQ p36.

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2023-SE-0130
Docket No. 07-2023-OSPI-01971
8612 - OSPI
Page 62

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

207.    By February 2024, the Student mastered the tactile discrimination goal.[425]

208.    At Baker, the Student is supported by a one-on-one education support professional (ESP) who is deaf and is proficient in ASL. That individual uses tactile signing with the Student.[426] The Student also has an ASL interpreter in her general education classes.[427]

209.    Nicole Lewis[428] is a TVI and has taught the Student at Baker since mid-November 2023.[429] Ms. Lewis spent one year teaching at a school for deafblind students and she has worked with several deafblind students during her 21-year teaching career.[430] In the four years she has taught at Baker, she estimates she has worked with four to six deafblind students. None of those students has had an intervener while at Baker.[431]

210.    Ms. Lewis works with the Student an hour per week.[432] When the Student started at Baker, she was working on tactile discrimination, tracking lines, and reading Braille words, all of which were goals from the District's November 2023 Draft IEP[433] that was implemented at Baker after some changes.[434]

211.    In her career Ms. Lewis has worked with students who have an autism diagnoses. Ms. Lewis continues to work with the Student, and she has not seen any indication while working with the Student that the Student falls on the autism spectrum.[435]

212.    Jennifer Seago[436] is the Student's case manager and ToD at Baker. She provides

---

[425] T583-584.

[426] T597.

[427] P32 p14; T662.

[428] Ms. Lewis has a bachelor's degree in elementary education and special education in visual impairment. She has a master's degree in psychology. She has taught in schools for 21 years. She has been employed by the District for four years. T576.

[429] T577.

[430] T593.

[431] T593.

[432] T577.

[433] P26.

[434] P32QQ p26. T578.

[435] T602.

[436] Ms. Seago has an associate's degree in early childhood education, a bachelor's degree in human development with a focus on early childhood development, and master's degrees in general education

direct instruction for reading, writing, math, communication, her adaptive skills, all of her IEP goals. I also support the vision goals, support the work recommended by her physical therapist, occupational therapist. I also set up her programming that her one-on-one implements.[437]

213.    Since the Student began at Baker, Ms. Seago has seen an increase in the Student's independence. The Student now helps prepare supplies for her feedings and participates during the process, where previously she was a passive participant. The Student is also ambulating more independently. She will collect her cane from a hook on the wall and will go into the hallway on her own during breaks to mingle with her peers.[438] Ms. Seago determined the Student had a language delay when arriving at Baker that she describes as follows:

> I can't speak to her other programming, but what I can speak to for us is every day she is able to express a new sign. And we give her language all day long. She is getting language through her support person, what is happening in the room, what is happening in the other side of the room, if a student is being loud, the announcements that go on overhead, what's happening in the hallway if there's something going on in the hallway. Any of our videos, it has captioning. But she is getting language from the moment she gets here to the moment she leaves, through sign, through tactile. So, as we know about language development, like you see with babies, they understand way more than they can put out.[439]

214.    Ms. Seago believes it is important for the Student to have a ToD because,

> [s]he needs somebody with experience and background in bilingual education and a language that is very evident her preferred mode of communication. She also needs to be surrounded with critical mass, with her peers that can also fluently communicate with her. It is not just a program.

---

and special education with a focus as a deaf education specialist. She has been a teacher for 14 years. She taught for nine years at the Washington School for the Deaf. She is in her second year as a ToD in the Tacoma District. T611-612.

[437] T615.

[438] T616.

[439] T628.

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2023-SE-0130
Docket No. 07-2023-OSPI-01971
8612 - OSPI
Page 64

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

ASL also has, like any language, a culture. And having access to that and the incidental learning that happens within a culture in a language.[440]

215.    Ms. Seago believes it is important for every deaf student who does not have access to listening and spoken language to be provided sign language.[441] In her opinion, communication for the Student should be provided as SDI in order for her to be able to express herself and access other academics.[442]

216.    The Student uses an AAC device at Baker approximately once or twice a week for vocabulary and spelling.[443] She is resistant to using the device and prefers to communicate through tactile signing.[444] Tactile signing and ASL are her preferred method of communication.[445]

217.    The Student does not have an intervener at Baker; however, her ESP at Baker is taking the intervener modules through Utah State University and the Tacoma district is creating the intervener position to support the Student.[446]

218.    The Parent transports the Student to Baker each day. She drives a total of 64 miles each day and pays $9.00 in tolls daily.[447]

## CONCLUSIONS OF LAW

### Jurisdiction

1.    The Office of Administrative Hearings (OAH) has jurisdiction over the parties and subject matter of this action for the Superintendent of Public Instruction as authorized by 20 United States Code (USC) §1400 *et seq.*, the Individuals with Disabilities Education Act (IDEA), Chapter 28A.155 Revised Code of Washington (RCW), Chapter 34.05 RCW, Chapter 34.12 RCW, and the regulations promulgated under these provisions, including 34 Code of Federal Regulations (CFR) Part 300, and Chapter 392-172A Washington Administrative Code (WAC).

---

[440] T632.

[441] T637.

[442] T638.

[443] T618-619.

[444] T623.

[445] T619.

[446] T639-640.

[447] P32 p14.

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2023-SE-0130
Docket No. 07-2023-OSPI-01971
8612 - OSPI
Page 65

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

2.      The IDEA is silent as to which party bears the burden of proof in the due process hearing. In *Schaffer v. Weast*, 546 U.S. 49, 51 (2005), the United States Supreme Court considered this issue and held that "the burden lies, as it typically does, on the party seeking relief." In Washington state, the legislature recently enacted a new law that places the burden of proof on school districts in due process hearings. Senate Bill 5883 (SB 5883), which adds a new section to RCW 28A.155, was signed by Governor Jay Inslee on March 13, 2024, and took effect on June 6, 2024. However, because this hearing took place prior to the enaction of SB 5883, the ruling in *Schaffer* controls when assigning the burden of proof.[448] The Parent is seeking relief and therefore bears the burden of proof in this case. She does not contest that she bears the burden. The U.S. Supreme Court and Washington courts have generally held that the standard of proof in an administrative proceeding is a preponderance of the evidence.[449] Therefore, the Parent's standard of proof in this matter is preponderance of the evidence.

**The IDEA and FAPE**

3.      Under the IDEA, a school district must provide a free and appropriate public education (FAPE) to all eligible children. In doing so, a school district is not required to provide a "potential-maximizing" education, but rather a "basic floor of opportunity."[450]

4.      In *Rowley*, the U.S. Supreme Court established both a procedural and a substantive test to evaluate a state's compliance with the IDEA. The first question is whether the state has complied with the procedures set forth in the IDEA. The second question is whether the individualized education program developed under these procedures is reasonably calculated to enable the child to receive educational benefits. "If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more."[451]

5.      Procedural safeguards are essential under the IDEA, particularly those that protect the parent's right to be involved in the development of their child's educational plan.[452] Procedural violations of the IDEA amount to a denial of FAPE and warrant a remedy only if they:

---

[448] *Schaffer v. Weast*, 546 U.S. 49, 62 (2005).

[449] *Steadman v. SEC*, 450 U.S. 91, 102 (1981); *Thompson v. Dep't of Licensing*, 138 Wn.2d 783, 797 (1999); *Hardee v. Dep't of Social & Health Services*, 172 Wn.2d 1, 4 (2011).

[450] *Bd. of Educ. of Hendrick Hudson Central Sch. Dist. v. Rowley*, 458 U.S. 176, 197 n.21, 200-201 (1982).

[451] *Rowley*, 458 U.S. at 206-07.

[452] *Amanda J. v. Clark County Sch. Dist.*, 267 F.3d 877, 882 (9th Cir. 2001).

Findings of Fact, Conclusions of Law, and Final Order
Cause No. 2023-SE-0130
Docket No. 07-2023-OSPI-01971
8612 - OSPI
Page 66

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA 98504-2489
(800) 845-8830
(206) 587-5135

(I) impeded the child's right to a free appropriate public education;
(II) significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of a free appropriate public education to the parents' child; or
(III) caused a deprivation of educational benefits.[453]

6.      "To meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances."[454] The determination as to whether an IEP is reasonably calculated to offer a student FAPE is a fact-specific inquiry. As the U.S. Supreme Court has made clear, "[a] focus on the particular child is at the core of the IDEA," and an IEP must meet a child's unique needs.[455] The "essential function of an IEP is to set out a plan for pursuing academic and functional advancement."[456] Accordingly, an IEP team is charged with developing a comprehensive plan that is "tailored to the unique needs of a particular child."[457] Additionally, the Student's "educational program must be appropriately ambitious in light of his circumstances . . . ."[458]

7.      In reviewing an IEP, "the question is whether the IEP is *reasonable*, not whether the court regards it as ideal."[459] The determination of reasonableness is made as of the time the IEP was developed.[460] An IEP is "a snapshot, not a retrospective."[461]

8.      As set forth in *Van Duyn v. Baker Sch. Dist.*, 502 F.3d 811, 822 (9th Cir. 2007), only material failures to implement an IEP violate the IDEA. Minor discrepancies in the services required by the IEP do not violate the IDEA.[462]

---

[453] 20 USC §1415(f)(3)(E)(ii); WAC 392-172A-05105(2); 34 CFR §300.513(a)(2).

[454] *Endrew F. v. Douglas County Sch. Dist. RE-1*, 580 U.S. 386, 137 S. Ct. 988, 999, 197 L. Ed. 2d 335 (2017).

[455] *Id.*

[456] *Id.*

[457] *Id.* at 1000.

[458] *Id.*

[459] *Id.* at 999 (emphasis in original).

[460] *Adams v. Oregon*, 195 F.3d 1141, 1149 (9th Cir. 1999).

[461] *Id.*

[462] *Id.*

Findings of Fact, Conclusions of Law, and Final Order
Cause No. 2023-SE-0130
Docket No. 07-2023-OSPI-01971
8612 - OSPI
Page 67

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA 98504-2489
(800) 845-8830
(206) 587-5135

**Issues c(i) - c(viii) – Whether the November 2021 Reevaluation was Appropriate and Whether the District Failed to Timely Respond to the Parent's Request for an Independent Educational Evaluation (IEE)**[463]

9.      The Parent challenges the appropriateness of the District's November 2021 Revaluation. For the reasons addressed below, the record shows the November 2021 Reevaluation was appropriate.

<u>Applicable Law</u>

10.      A school district must reevaluate a student at least every three years unless the parent and the district agree that a reevaluation is unnecessary.[464]

11.      A reevaluation must comply with the requirements set out in WAC 392-172A-03020 to 03080. Under these procedures, a "group of qualified professionals selected by the school district" must use a "variety of assessment tools and strategies to gather relevant functional, developmental, and academic information about the student, including information provided by the parent . . . ."[465] The group must not use any single measure or assessment as the sole criterion for determining eligibility or educational programming, and must use technically sound instruments that may assess the relative contribution of cognitive, behavioral, physical and developmental factors.[466]

12.      Assessments must be administered by "trained and knowledgeable personnel" and "in accordance with any instructions provided by the producer of the assessments." Students must be assessed "in all areas related to the suspected disability" and the evaluation must be "sufficiently comprehensive to identify all of the student's special education and related service needs, whether or not commonly linked to the disability category in which the student has been classified."[467]

13.      Under WAC 392-172A-03025, as part of any evaluation or reevaluation, the team must review existing data on the student, including evaluations, information provided by the parents, current classroom-based, local, or state assessments,

---

[463] Based on the Parent's statement in her Post-Hearing Brief that "Parent is not pursuing the Braille issue for purposes of relief," the tribunal does not address issue c(iv) that addresses Braille instruction.

[464] WAC 392-172A-03015(2)(b); 34 CFR §300.303(b)(2).

[465] WAC 392-172A-03020(2).

[466] *Id*.; *see also* 34 CFR §300.304.

[467] WAC 392-172A-03020; *see also* 34 CFR §300.304(c).

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2023-SE-0130
Docket No. 07-2023-OSPI-01971
8612 - OSPI
Page 68

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

classroom-based observations, and observations by teachers and related services providers. WAC 302-172A-03025 further requires that the team:

> (2)(a) On the basis of that review, and input from the student's parents, identify what additional data, if any, are needed to determine:
>
> (i) Whether the student is eligible for special education services, and what special education and related services the student needs; or
>
> (ii) In case of a reevaluation, whether the student continues to meet eligibility, and whether the educational needs of the student including any additions or modifications to the special education and related services are needed to enable the student to meet the measurable annual goals set out in the IEP of the student and to participate, as appropriate, in the general education curriculum; and
>
> (b) The present levels of academic achievement and related developmental needs of the student.

14.    Under WAC 392-172A-03020, a school district must ensure that:

> (3)(a) Assessments and other evaluation materials used to assess a student:
>
> (i) Are selected and administered so as not to be discriminatory on a racial or cultural basis;
>
> (ii) Are provided and administered in the student's native language or other mode of communication and in the form most likely to yield accurate information on what the student knows and can do academically, developmentally, and functionally unless it is clearly not feasible to so provide or administer; . . .

15.    Like IEPs, the appropriateness of an evaluation must be determined in light of what was known, or should have been known, at the time the evaluation was conducted. Also, whether an evaluation is appropriate should not be judged in hindsight. This is the so-called snapshot rule.[468]

16.    School districts "must ensure that...[t]he student is assessed in all areas related to the suspected disability, including, if appropriate, health, vision, hearing, social and emotional status, general intelligence, academic performance,

---

[468] *See Adams v. Oregon*, 195 F.3d 1141, 31 IDELR 130 (9th Cir. 2001).

Findings of Fact, Conclusions of Law, and Final Order
Cause No. 2023-SE-0130
Docket No. 07-2023-OSPI-01971
8612 - OSPI
Page 69

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA 98504-2489
(800) 845-8368
(206) 587-5135

communicative status, and motor abilities."[469] Further, the IDEA does not give parents the right to dictate the areas in which a school district must assess a student as part of a special education evaluation.[470]

17.    The Parent first claims that the District failed to timely respond to the Parent's request for an IEE. The Parent did not brief this issue and did not specify which IEE was not responded to timely. The Parent requested an IEE on November 24, 2021, and the District filed a due process hearing request on December 6, 2021, in response. Under WAC 392-172A-05005(2)(c), if a parent requests an IEE at public expense, the District must either provide the IEE without delay, or initiate a due process hearing within fifteen days to show that its evaluation is appropriate. Here, the District initiated the due process hearing request in less than fifteen days from the IEE request, so there is no issue of timeliness with the District's response. The District filed another due process hearing request on June 6, 2022, based on what it understood to be another request from the Parent for an IEE at public expense. The District withdrew its request for hearing after the Parent made clear she did not request an IEE. Based on this, there is no evidence to support a claim that the District did not timely respond to the Parent's request for an IEE.

18.    The Parent has not met her burden to prove that the District failed to timely respond to her request for an IEE at public expense.

19.    **Issue c(i):** The Parent argues that the District frequently failed to utilize evaluators that were knowledgeable of sign language and capable of communicating with the Student using sign language; therefore, the District did not evaluate the Student in one of her primary modes of communication most likely to yield accurate information. Evidence in the record does not support this claim.

20.    The evaluators relied on modes of communication the Student primarily used or understood at the time of the November 2021 Reevaluation – verbal commands, the AAC device and some adapted signs – to communicate with the Student. The Student relied mostly on her AAC device to communicate in school at the time of the Reevaluation and she knew eight to ten adapted signs. While it is true that no member of the staff at HHES was fluent in ASL for the November 2021 Reevaluation and none of the staff used tactile signing with the Student at the time, the record does not

---

[469] WAC 392-172A-03020(3)(e).

[470] *See Letter to Unnerstall,* 68 IDELR 22 (OSEP 2016); *L.C. v. Issaquah Sch. Dist.,* 2019 U.S. Dist. LEXIS 77834, 2019 WL 2023567 (W.D. Wash 2019)(citing *Avila v. Spokane Sch. Dist. 81,* 686 F. App'x 384, 385 (9th Cir. 2017)), *aff'd sub nom. Crofts v. Issaquah Sch. Dist. No. 411,* 2022 U.S. App. LEXIS 907 (9th Cir. 2022).

support a conclusion that ASL, tactile signing, or SimCom was the Student's preferred mode of communication in November 2021.[471] The Parent's argument that not using the Student's "preferred mode of communication" is no different than testing a typical speaking student in a foreign language only stands if the evidence shows the Student was fluent in ASL or tactile signing and used it as her primary method of communication; however, this is not the case. There is no evidence showing the Student would have been able to comprehend instructions from the evaluators during the Reevaluation if they had been given in ASL or tactile signing. Instead, the evaluators used the modes of communication the Student could understand at the time and that were likely to yield the most accurate information.

21.    The Parent has not met her burden to prove this claim.

22.    **Issue c(ii):** The Parent asserts that the assessments administered do not best ensure that, based on the Student's impairments, the results accurately reflect the Student's aptitude or achievement level or whatever other factors the test purports to measure. The Parent failed to produce evidence to support this claim.

23.    The Parent in her Post-Hearing Brief does not identify an administered assessment that she objects to, nor does she identify a specific assessment the District should have used. The Parent focuses on the fact that the District did not administer academic achievement testing for the Student. School Psychologist Samantha Ewing did not administer an academic achievement test during her assessment of the Student because, "the academic achievement tests have pretty complex verbal instructions, and are not usually appropriate to administer to students who have limited verbal skills or who might not understand what is being asked of them." In lieu of the academic testing, Ms. Ewing used classroom data from the Student's special education teacher and a checklist of functional academic skills. As part of the academic assessment, Ms. Ewing also reviewed an IEE conducted in December 2020, which had administered the Styer-Fitzgerald Program for Functional Academics Student Assessment. Ms. Ewing has a degree in psychology and experience administering the assessments she performed as part of the Student's Reevaluation. There is no evidence presented that incorrect assessments were administered or that Ms. Ewing did not administer them according to assessment instructions. The Parent presents no evidence showing that academic data from the Student's teachers, the functional academic check list, or information from the prior IEE are insufficient to reflect the Student's academic progress. The evidence in the record does not show

---

[471] The Parent did not understand until Spring 2022 that tactile signing might be the Student's preferred method of communication.

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2023-SE-0130
Docket No. 07-2023-OSPI-01971
8612 - OSPI
Page 71

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

that, based on the Student's impairments, the academic assessment performed does not accurately reflect the Student's aptitude or achievement level.

24.     The Parent has not met her burden to prove this claim.

25.     **Issue c(iii):** The Parent broadly raises the claim that the Reevaluation failed to assist in the development of appropriate content for all areas of the Student's IEP. The Parent did not brief this issue. The nature of her claim is unclear and the evidence on which she relies is not apparent. The record shows that the District obtained consent to test the Student in the areas of audiology, social/emotional/behavioral, math, writing, fine motor, vision/orientation and mobility, student observation, functional behavioral assessment, medical-physical, general education, adaptive, cognitive, reading, communication, and gross motor. The record shows the District assessed the Student in those areas and there is no evidence demonstrating that the assessments and tests were administered improperly or failed to provide sufficient information to support development of an appropriate IEP.

26.     The Parent has not met her burden to prove this claim.

27.     **Issue c(v):** The Parent claims the November 2021 Reevaluation failed to adequately evaluate the Student to determine her capacity for communicating and learning through sign languages. For the reasons outlined below, this argument is unsupported by evidence in the record.

28.     As discussed above, a district evaluation must be "sufficiently comprehensive to identify all of the child's special education and related service needs," it must be completed by qualified individuals, and the evaluators must use "a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information about the student, including information provided by the parent."[472] While information from a parent is to be considered, a parent does not have the right to dictate the areas in which a school district must assess a student.[473] Here, Elizabeth Comstock, who has a master's degree in communication disorders and has worked as an SLP for over thirty years, was qualified to perform the communication portion of the Reevaluation. Ms. Comstock used a variety of assessment tools and strategies to gather information about the Student. She considered the Student's

---

[472] WAC 392-172A-03020; *see also* 34 CFR §300.304(c); WAC 392-172A-03020(2).

[473] *See Letter to Unnerstall,* 68 IDELR 22 (OSEP 2016); *L.C. v. Issaquah Sch. Dist.,* 2019 U.S. Dist. LEXIS 77834, 2019 WL 2023567 (W.D. Wash 2019)(citing *Avila v. Spokane Sch. Dist. 81,* 686 F. App'x 384, 385 (9th Cir. 2017)), *aff'd sub nom. Crofts v. Issaquah Sch. Dist. No. 411,* 2022 U.S. App. LEXIS 907 (9th Cir. 2022).

educational history and progress toward her IEP goals, administered the K-12 Life Skills Communication Checklist, an AAC Checklist, a Functional Communication Profile-Revised Checklist, and the Peabody Picture Vocabulary Test 4. There is no testimony or other evidence from a licensed SLP that demonstrates that the tests and checklists administered were not sufficient to gather the required relevant information about the student. Notably, the Parent did not request an ASL assessment as part of the November 2021 Reevaluation. The Parent relies heavily on the opinions of Dr. Wilson and other non-SLPs to second-guess the decisions made by the Student's SLP; however, the tribunal gives little weight to those opinions that judge the Reevaluation in hindsight, using knowledge gathered after the Reeavluation that was not available to the assessors at the time. Specifically, Dr. Wilson met the Student more than a year after the Reevaluation, which limits the weight of his opinion about the accuracy of the Reevaluation. The evidence in the record does not support a conclusion that the District failed to meet the requirements of WAC 392-172A-03020 when it did not perform an assessment to test the Student's capacity for ASL communication as part of the Reevaluation.

29.    The Parent has not met her burden to prove this claim.

30.    **Issue c(vi):** The Parent argues that the District failed to adequately determine how to meet the Student's communication needs in the school setting when it was "apparent during the evaluation that Student would not tolerate having devices on her ears." The Parent has not articulated this claim in her briefing, and, as there is no evidence showing the District attempted to use devices on the Student's ears during the Reevaluation, the claim misstates the facts. As is outlined above, the communication portion of the Reevaluation meets the requirements of the WAC.

31.    **Issue c(vii):** The Parent argues that the District's Reevaluation failed to assess whether the Student qualifies under the category of autism and determine appropriate programming based on her needs. The Parent's evidence failed to show that additional testing for autism was required.

32.    The results of the Student's BASC-3 assessment showed an elevated content scale score that may indicate a developmental disorder such as autism but could also represent poor socialization. Ms. Ewing, an experienced school psychologist, did not perform further assessments for autism based on her informed opinion that a variety of other causes can result in the same response pattern for a student. She also did not make a follow-up determination about autism because neither the Parent nor any District teachers or staff raised a concern about autism. Ms. Ewing noted that the Student received services in all the areas that students with autism receive services.

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2023-SE-0130
Docket No. 07-2023-OSPI-01971
8612 - OSPI
Page 73

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

According to Ms. Ewing, "if we suspected that she had autism, it wouldn't have changed what support she was given."

33.    The evidence in the record does not support a conclusion that the District's Reevaluation was inappropriate because the District failed to administer further testing for autism. None of the Student's teachers at HHES suspected the Student was autistic and none recalled the Parent expressing a concern about potential autism. Notably, communication from the Parent's attorney after the Reevaluation does not identify a potential autism diagnoses among her other concerns raised. The Parent relies on the diagnoses of Dr. Wilson in support of her assertion that the District failed to follow up on signs of autism. Dr. Wilson based his autism diagnoses on the SRS-2 rating scale and consideration of "other data" and the "overall result" of his communication with the Student; however, he was unable to specify what other data and overall results he considered. Again, the Parent's argument depends on information that was not available to the assessors at the time of the Reevaluation. Based on the information that was available to the assessors at the time of the November 2021 Reevaluation, the District was not required to administer further assessments to test for autism and it did not fail in its responsibility to the Student when declined to do so.

34.    The Parent has not met her burden to prove this claim.

35.    **Issue c(viii):** The Parent's final challenge to the appropriateness of the November 2021 Reevaluation is that the District failed to conduct an appropriate Functional Behavioral Analysis (FBA) of the Student. The Record does not support a conclusion that the FBA was procedurally or substantively inappropriate,

36.    Ms. Ewing, the District's psychologist, performed the FBA and considered behavioral data from the staff working directly with Student as well as reports about the Student's behaviors at home. She also considered a behavior report prepared by BCBA Dy Thompson. BASC-3 results from the Student's teachers did not mention aggressive behavior exhibited by the Student, in contrast with the Parent's BASC-3 ratings which included ratings in the significant range for aggressive behavior and specific ratings related to "almost always [throwing or breaking] things when angry. Based on the results of her assessments, Ms. Ewing determined the Student did not require a behavior intervention plan (BIP). The Student's special education teacher also did not believe a BIP was necessary for the Student. The Parent did not brief this claim and no evidence in the record contradicts a conclusion that the FBA completed by the District was appropriate.

37.    The Parent has not met her burden to prove this claim.

38.     In conclusion, for the reasons discussed above, the Parent has not shown that the District's November 2021 Reevaluation was inappropriate.

**Implementation and Appropriateness of the IEP**

39.     The remaining issues raised by the Parent concern the implementation and the appropriateness of the Student's IEP.

<u>Applicable Law</u>

40.     A school district's obligation to provide the special education and related services provided in a student's IEP does not require "perfect adherence to the IEP … ."[474] Failure to implement an IEP constitutes a denial of FAPE only "when the services provided to a disabled child fall significantly short of those required by the IEP," so as to constitute a material failure.[475]

41.     Minor discrepancies in the services required by the IEP do not violate the IDEA.[476]

"[S]pecial education and related services" need only be provided *in conformity with* the IEP. [20 USC §1401(9).] There is no statutory requirement of perfect adherence to the IEP, nor any reason rooted in the statutory text to view minor implementation failures as denials of a free appropriate public education.

* * *

We hold that a *material* failure to implement an IEP violates the IDEA. A material failure occurs when there is more than a minor discrepancy between the services a school provides to a disabled child and the services required by the child's IEP.[477]

42.     Under the WAC, in special education cases, except in certain disciplinary cases,

during the pendency of any administrative hearing or judicial proceeding regarding the due process hearing proceedings, the student involved in the

---

[474] *Van Dyun v. Baker Sch. Dist.* 5J, 481 F.3d 770, 779 (9th Cir. 2007).

[475] *Id.* at 773.

[476] *Id.*

[477] *Id*. at 821-22 (italics in original).

Findings of Fact, Conclusions of Law, and Final Order
Cause No. 2023-SE-0130
Docket No. 07-2023-OSPI-01971
8612 - OSPI
Page 75

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA 98504-2489
(800) 845-8830
(206) 587-5135

hearing request must remain in his or her current educational placement, unless the school district and the parents of the child agree otherwise.[478]

43.    This is commonly referred to as the "stay-put" provision.[479] Its purpose is to maintain the status quo while an administrative or judicial dispute about a student's education is pending.[480]

44.    Reasonable delays incurred in implementing an IEP while a school district conducts assessments and negotiates with parents are not material.[481]

45.    The determination as to whether an IEP is reasonably calculated to offer a student FAPE is a fact-specific inquiry that must focus on the unique needs of the student at issue. "A focus on the particular child is at the core of the IDEA," and an IEP must meet a child's "*unique* needs."[482] "Any review of an IEP must appreciate that the question is whether the IEP is *reasonable*, not whether the court regards it as ideal."[483] The determination of reasonableness is made as of the time the IEP was developed.[484] An IEP is "a snapshot, not a retrospective."[485]

46.    WAC 392-172A-03110(1) requires an IEP team, in developing an IEP, to consider the student's strengths; the student's most recent evaluation results; the academic, developmental, and functional needs of the student; and the parents' concerns for enhancing the student's education. The IEP team must also consider special factors unique to the student, including the use of positive behavioral interventions and supports, to address behavior, in the case of a student whose behavior impedes the student's learning or that of others.[486] In such a case, the IEP

---

[478] WAC 392-172A-05125(1). See also 20 USC § 1415(j); 34 CFR § 300.518(a).

[479] See, e.g., *K.D. ex rel. C.L. v. Haw. Dep't of Educ.*, 665 F.3d 1110, 1120 (9th Cir. 2011).

[480] *Id.*

[481] *See J.S. v. Shoreline Sch. Dist.,* 220 F. Supp. 2d 1175, 1189 (W.D. Wash. 2002) (finding that implementation delay that occurred at "behest of the parents ... was reasonable and was not ... error"); *cf. Tracy N. v. Haw. Dep't of Educ.,* 715 F. Supp. 2d 1093, 1112 (D. Haw. 2010) (finding that delay in determining student's educational placement was reasonable because there were "ongoing discussions regarding placement in response to [the student's mother's] concerns, a reassessment of [the student's] cognitive and academic skills, and a reevaluation of [her] behavior").

[482] *Endrew F.,* 137 S. Ct. at 999 (emphasis in original).

[483] *Id.* (emphasis in original).

[484] *Adams v. State of Oregon*, 195 F.3d 1141, 1149 (9th Cir. 1999).

[485] *Id.*

[486] WAC 392-172A-03110(2)(i).

Findings of Fact, Conclusions of Law, and Final Order
Cause No. 2023-SE-0130
Docket No. 07-2023-OSPI-01971
8612 - OSPI
Page 76

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

team shall consider the use of positive behavioral interventions and supports to address that behavior.[487]

### Issue a(ii) – Whether the District denied the Student FAPE when it did not update or implement the Student's IEP during the 2021-2022 school year

47.     The Parent claims the District failed to provide the Student with a FAPE by not updating or implementing the Student's IEP during the 2021-2022 school year. For the reasons addressed below, the Parent has not shown that the District failed to update or implement the Student's IEP during the 2021-2022 school year.

48.      The IDEA mandates annual review of a student's IEP.[488] In this case, in the 2021-2022 school year, the Student's annual IEP meeting was due to occur by October 27, 2021, and the IEP "start date" was October 30, 2021.

49.     It is undisputed that the IEP team did not develop an annual IEP on time. The Parent contends that the failure to timely implement or update the Student's annual IEP denied the Student FAPE. The District argues that the Student's October 2020 IEP was properly implemented during the 2021-2022 school year until the completion of the June 2022 IEP.

50.     In this case, the Parent and the District mutually agreed to delay development of the Student's annual IEP. In late October 2021, the parties agreed to postpone the annual IEP until after the reevaluation had been completed. In December 2021, the District had a due process hearing request pending before the Office of Administrative Hearings in response to the Parent's request for an IEE at the District's expense. Based on these pending matters, the record shows the Parent and the IEP Team agreed to delay development of the Student's annual IEP until the pending administrative matter was resolved. The Parent filed her own due process hearing request in January 2022, which continued the delay of the IEP development. Therefore, during the 2021-22 school year, the District implemented the October 2020 IEP through the end of the school year. The Parent and the District withdrew their hearing requests in April 2022. After the withdrawal, the IEP Team met within a reasonable time period. They held a meeting in May 2022 to update the IEP, followed by another meeting in June which resulted in the June 2022 IEP.

51.     To the extent the Parent claims the October 2020 IEP was not implemented during the 2020-21 school year, she has not articulated what elements of the IEP she

---

[487] WAC 392-172A-03110(2)(a)(i); 20 U.S.C. § 1414(d)(3)(B)(i); 34 C.F.R. § 300.324(a)(2)(i).

[488] 20 U.S.C. §1414(d)(4); see also 34 C.F.R. § 300.324(b)(1)(i); WAC 392-172A-03110(3)(a).

believes were not provided to the Student. There is no evidence in the record showing the Student's teachers and related service providers were not materially implementing the provisions included within the October 2020 IEP. Thus, Parent did not produce any credible evidence that anything more than a minor deficiency occurred in the implementation of the October 2020 IEP.

52.      To the extent that the delay in developing the annual IEP may have constituted a procedural violation of the IDEA, the Parent has not demonstrated that it impeded the Student's right to FAPE, significantly impeded her opportunity to participate in the decision-making process regarding the provision of FAPE, or caused a deprivation of educational benefits.[489] The Parent participated in and agreed to the decision to delay the development of the annual IEP, and to the continued implementation of the October 2020 IEP. Additionally, the Parent has not established that the Student required more SDI, related services, supplementary aids and services, or accommodations and modifications than the October 2020 IEP provided in order to receive FAPE.

53.      The Parent has not demonstrated that any delay in completing the Student's annual IEP between October 30, 2021, and June 7, 2022, denied the Student FAPE.

**Issues a(iii) - a(v) – Whether the District failed to provide FAPE when it did not provide the Student with an "adequately trained" intervener in the 2021-2022, 2022-2023, and 2023-2024 school years**

54.      The Parent argues that District's decision to provide the Student with an intervener training under the OHOA modules is the colloquial equivalent to putting lipstick on a pig. The District asserts that the June 2022 IEP did not identify any specific training level or certification for the Student's intervener, nor does the IDEA require any specific training or certification level for an intervener; therefore, the District argues, the interveners offered under the implemented IEP meet the requirements under the IDEA.

55.      According to evidence in the record, the first request for a 1:1 intervener trained in dual sensory loss came from the Parent at a meeting on December 10, 2021. The District gathered more information about interveners and intervener training in early 2022, with the help of Katie Humes with the Washington State DeafBlind Project. The IEP team considered this information, along with Linda Alsop's recommendation to provide an intervener after working with the Student. During the 2021-2022 school year, special education teacher Justine Malek completed three of the OHOA intervener

---

[489] WAC 392-172A-05105(2).

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2023-SE-0130
Docket No. 07-2023-OSPI-01971
8612 - OSPI
Page 78

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

modules and shared what she learned with the paraeducators at HHES. The Student's IEP Team added a 1:1 intervener to the Student's June 2022 IEP.

56.     As early as August 2022, two paraeducators at Goodman Middle School were taking the OHOA intervener training through NCDB in preparation for the Student attending Goodman in the fall. Training stopped after August 21, 2022, when the Parent notified the District that the Student would be attending St. Nick's that fall.

57.     After spending the 2022-2023 school year at St. Nick's, the Student started at Goodman in September 2023. Three paraeducators were taking the OHOA intervener modules at that time. Additionally, the District invited Emma Packard with the Washington DeafBlind project to provide on the job intervener training for the Student's paraeducators and she recommended that the providers continue training using the OHOA modules. The November 2023 Draft IEP prepared at Goodman called for an intervener for the Student. Before the training could progress, the Student transferred out of the District on November 7, 2023.

58.     The Parent does not define what she means by an "adequately trained" intervener, but the record shows she asked the District for an intervener trained by a "higher-level university program." She asserts that the training provided by the District to the Student's paraeducators was insufficient and analogizes its training to "putting lipstick on a pig." The record does not support this comparison. The OHOA modules are hosted by the Washington DeafBlind Program and according to Ms. Packard, "the Open Hands, Open Access modules don't lead directly to a credential or a certification as an intervener. But the information is much of the same information that an intervener would learn in a certified program... ." She noted that the modules target aspects of intervention and strategies that are appropriate for a student with combined impacts to vision and hearing. According to Katie Humes, the OHOA modules are "not designed to be a standalone, but it is a starting place, and it is what [Washington has] used and many other states have too." The idea that a paraeducator who studied the modules cannot serve as an intervener is also contradicted by Ms. Packard, who testified, regarding paraeducators serving as interveners, "I think that has always been my experience as it has moved as someone from an educator position to recognize more as an intervener."

59.     An intervener for the deafblind is not a codified position in Washington and there is no requirement in the state that an individual receive a national certification to work as an intervener. While a paraeducator who studied the OHOA module may not have received the same training as an intervener trained in the Utah State or Central Michigan intervener programs, and would not receive the same accreditation, there is

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2023-SE-0130
Docket No. 07-2023-OSPI-01971
8612 - OSPI
Page 79

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

no evidence showing that someone trained on the OHOA modules could not provide sufficient intervener services for the Student.

60.    The Parent has failed to show that the District denied the Student a FAPE when it provided services using paraeducators training as interveners through OHOA modules, rather than interveners with a national certification or other training.

**Issues a(vi) - a(viii) – Whether the District failed to provide FAPE when it did not provide the Student with a teacher of the deaf (ToD) in the 2021-2022, 2022-2023, and 2023-2024 school years**

61.    The Parent argues that the District deprived the Student of language at all relevant times by not providing the Student with access to a ToD and that the District failed to provide FAPE by failing to provide the Student's IEP teams with a member that is familiar with the needs of deafblind students. The District argues that no implemented IEP required a ToD and that there was no credible evidence at the time of development of the IEPs that showed the Student required a ToD.

62.    The record shows that, prior to the July 20, 2021 report from the sound booth testing, the District did not have any documentation that identified that the Student had a hearing loss that would qualify her for special education audiology services. As a result, the October 2020 IEP, which was implemented during the 2021-2022 school year, did not require a ToD.

63.    In May 2022, the Parent raised the possibility of a ToD for the Student to Amy McCall, the District audiologist. Ms. McCall has over thirty years of experience, including working with deaf and hard of hearing children from birth to three years old. Based on her experience, Ms. McCall expressed a desire to wait for an intervener to work 1:1 with the Student so the intervener could weigh in on whether the Student needed a ToD. The Student did not attend school in the District in the 2022-2023 school year and attended only for a few weeks in the 2023-2024 school year. There was little time to work with an intervener while the Student was in the District and allow the intervener to assess the Student's needs. While the District did not have a ToD on the IEP Team when developing the June 2022 IEP, the District considered input from both Ms. Humes and Ms. Alsop; although Ms. Alsop did not include a ToD among her recommendations to the IEP team. Dr. Wilson included a recommendation for a ToD in the IEE that was prepared after the development of the June 2022 IEP and there is no evidence showing that Dr. Wilson's recommendations were not considered by the later IEP teams.

64.    Ms. Alsop testified that she believed the Student needed a ToD or that her providers should at least have access to a ToD; however, she did not include a ToD among her recommendations for the IEP Team in May 2022. Ms. Alsop testified that the ToD would understand the need for the Student to be near the teacher and to have an FM system. The tribunal notes that the Student's providers, without the input of a ToD, identified the need for proximity to a teacher and stressed the benefits of trying an FM system.

65.    While the facts are clear that the Student is showing progress under the instruction of a ToD in the Tacoma District, the appropriateness of the IEP is to be determined at the time it was developed, not after-the-fact. Here, as of June of 2022, the IEP Team considered the request from the Parent for a ToD and the Student's current needs. Based on what the IEP Team knew at that time, the team determined more information was needed before providing a ToD for the Student. While hindsight shows the Student would benefit from a ToD, the IEP Team's decision at the time to not add a ToD was reasonable and was not a denial of FAPE.

66.    The Parent has not met her burden to prove this claim.

**Issue a(ix) – Whether the District failed to provide FAPE by failing to provide Student with IEPS reasonably calculated to allow Student to make meaningful progress in all areas of educational programming by, at all relevant times, including the 2023-2024 school year, failing to timely provide an intervener and/or other staff with the requisite skills to allow Student consistent and appropriate access to sign languages as a mode of communication so she could meaningfully benefit from her: (1) academic environment in the school setting, and (2) her social environment in the school setting**

**Issue a(xi) – Whether the district failed to provide FAPE by failing to provide Student with IEPS reasonably calculated to allow Student to make meaningful progress in all areas of educational programming by, at all relevant times, failing to provide Student with adequate instruction in sign language, which includes modified sign language, American sign language, and tactile sign language**

67.    Issues a(ix) and a(xi) both essentially raise the concern about a lack of access to or instruction in sign language; therefore, the two issues are considered together.[490]

---

[490] Issue a(x) concerns provision of instruction in Braille. Based on the Parent's statement in her Post-Hearing Brief that "Parent is not pursuing the Braille issue for purposes of relief," the tribunal does not address the issue related to Braille instruction.

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2023-SE-0130
Docket No. 07-2023-OSPI-01971
8612 - OSPI
Page 81

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

68.     As is addressed above, the only IEP developed by the District in this matter during the relevant time period is the June 2022 IEP. The District created a draft IEP in November 2023, but that IEP was never finalized or implemented because the Student left the District. Therefore, the tribunal examines only the appropriateness of the June 2022 IEP as it addressed instruction in sign language.

69.     The Student met her October 2020 IEP goal related to signing, which increased her use of unprompted signs from five to six, to eight to ten. At the time of the November 2021 Reevaluation, the Student knew 20 to 30 adapted signs she used with prompting from an adult. By the end of the fifth-grade year, the Student knew between 30 and 40 signs, but was still only using five signs unprompted.

70.     The June 2022 IEP includes one goal related to signing, calling for the Student to be able to find and use ten words or signs with no prompting. Because the Student left the District shortly after the implementation of the June 2022 IEP, progress on this goal within the District cannot be measured.

71.     When determining whether an IEP is appropriate, the "question is whether the IEP is reasonable, not whether the court regards it as ideal."[491] The determination of reasonableness is made as of the time the IEP was developed.[492] An IEP is "a snapshot, not a retrospective."[493] The record shows that, at the time of development of the June 2022 IEP, the Student had dexterity issues that affected her ability to sign and she used some adapted sign language, but it was not the Student's primary mode of communication. The Student, when in school, relied primarily on her AAC device, used in conjunction with some adapted signs. Based on this, the IEP Team set goals to continue improving the Student's use of unprompted signs but did not treat signing as her primary mode of communication. The question before the tribunal is whether the level of sing language instruction provided under the June 2022 IEP was reasonable, based on the knowledge the IEP Team had at the time. The tribunal cannot consider the fact that the Student is making impressive progress with her signing in her current placement or that it is clear now to her service providers that tactile signing is her preferred mode of communication. Based on the information available to the IEP Team at the time, the District did not deny the Student FAPE based on the level and type of instruction it provided for the Student under the June 2022 IEP.

72.     The Parent has not met her burden to prove claims a(ix) and a(xi).

---

[491] *Rowley*, U.S. at 206-07.

[492] *Adams v. State of Oregon*, 195 F.3d 1141, 1149 (9th Cir. 1999).

[493] *Id.*

Findings of Fact, Conclusions of Law, and Final Order
Cause No. 2023-SE-0130
Docket No. 07-2023-OSPI-01971
8612 - OSPI
Page 82

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA 98504-2489
(800) 845-8830
(206) 587-5135

**Issue a(xii) – Whether the District failed to provide FAPE by failing to provide Student with IEPS calculated to allow Student to make meaningful progress in all areas of educational programming by, at all relevant times, creating and implementing an IEP that is not appropriate for Student on days when her vision is more negatively impacted due to her CVI**

73.    The Parent did not brief this claim and she has not articulated what she believes the Student's IEPs failed to provide or what aspects of the Student's IEPs were not implemented in this regard. Moreover, a review of the record shows that it does not contain sufficient evidence to support the Parent's claim. Both the October 2020 IEP and the June 2022 IEP provided the Student with vision support and multiple accommodations specifically related to vision. There is no evidence in the record that the District failed to materially implement these provisions. Additionally, there is no evidence in the record that the June 2022 IEP failed to provide sufficient vision support and/or accommodations to meet the Student's needs.

74.    The Parent has not met her burden to prove issue a(xii).

**Issue a(xiii) – Whether the District Failed to Provide FAPE by Failing to Provide Student with IEPs Reasonably Calculated to Allow Student to Make Meaningful Progress in all Areas of Educational Programming by Failing to Provide Student With Appropriate Extended School Year Services During the Summers Prior to the 2021-2022 and 2022-2023 School Years**

75.    WAC 392-172A-02020 provides for ESY services:

(1) Extended school year services means services meeting state standards contained in this chapter that are provided to a student eligible for special education:

(a) Beyond the normal school year;

(b) In accordance with the student's IEP; and

(c) Are provided at no cost to the parents of the student.

(2) School districts must ensure that extended school year services are available when necessary to provide a FAPE to a student eligible for special education services.

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2023-SE-0130
Docket No. 07-2023-OSPI-01971
8612 - OSPI
Page 83

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

(3) Extended school year services must be provided only if the student's IEP team determines on an individual basis that the services are necessary for the provision of FAPE to the student.

(4) A school district may not limit extended school year services to particular categories of disability or unilaterally limit the type, amount or duration of those services.

(5) The purpose of extended school year services is the maintenance of the student's learning skills or behavior, not the teaching of new skills or behaviors.

(6) School districts must develop criteria for determining the need for extended school year services that include regression and recoupment time based on documented evidence, or on the determinations of the IEP team, based upon the professional judgment of the team and consideration of factors including the nature and severity of the student's disability, rate of progress, and emerging skills, with evidence to support the need.

(7) For the purposes of subsection (6) of this section:

(a) Regression means significant loss of skills or behaviors if educational services are interrupted in any area specified on the IEP;

(b) Recoupment means the recovery of skills or behaviors to a level demonstrated before interruption of services specified on the IEP.

76.    The October 2020 IEP did not approve the Student for ESY services. The Student was approved for ESY services in the June 2022 IEP. In July 2021, the District offered ESY services through a summer school class taught by a certificated special education teacher, who would develop the program. The District offered to provide transportation with a paraeducator on the bus with the Student. The Parent declined the offered ESY services in July 2021.

77.    In May 2022, the District again offered ESY services. The Parent declined the offered ESY services and instead asked that the Student work with the Parent's chosen private intervener as her ESY services. The District declined the request to provide the Student's work over the summer with an intervener as ESY services. The record does not show whether the private intervener would have been working on new skills and behaviors with the Student or whether the intervener would have been working to maintain skills and behavior of the Student.

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2023-SE-0130
Docket No. 07-2023-OSPI-01971
8612 - OSPI
Page 84

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

78.     There is no evidence in the record of the contents of the 2021 or 2022 ESY program, nor is there evidence that either program would not meet the needs of the Student. Additionally, the record does not indicate that the Student required more ESY than what the District offered. The record shows that the District offered ESY services both summers and the Parent declined the offers. The Parent has not shown why the ESY services offered would not have satisfied the requirements of the WAC. Accordingly, the Parent has not met her burden to show that the District failed to provide the Student with the ESY services she needed.

**Issue a(xiv) – Whether the District failed to provide FAPE by failing to provide Student with IEPs reasonably calculated to allow Student to make meaningful progress in all areas of educational programming by failing to provide Student with an appropriate behavior intervention plan (BIP) subsequent to its November 2021 Evaluation**

79.     WAC 392-172A-03110(1) requires an IEP team, in developing an IEP, to consider the student's strengths; the student's most recent evaluation results; the academic, developmental, and functional needs of the student; and the parents' concerns for enhancing the student's education. The IEP team must also consider special factors unique to the student, including the use of positive behavioral interventions and supports, to address behavior, in the case of a student whose behavior impedes the student's learning or that of others.[494] A functional behavior assessment is one type of behavioral intervention or strategy that helps identify causative factors and objectionable behaviors.[495] A BIP is a plan incorporated into a student's IEP if the IEP team determines that it is necessary for the Student to receive FAPE.[496]

80.     Here, the District performed an FBA as part of the November 2021 Reevaluation. As is addressed above, the record shows the FBA was procedurally and substantively appropriate. The data reviewed by school psychologist Ms. Ewing showed that the Student's behavior observed in the home environment did not align with behavior reported in the school environment. The Student displayed some mild task refusal behaviors in the school setting, but those behaviors were not significant and there was no aggression exhibited by the Student in school. As a result of the FBA, Ms. Ewing determined that a BIP was not necessary for the Student. The Student's special education teacher, Ms. Malek, agreed with this determination. There is no evidence in

---

[494] WAC 392-172A-03110(2)(i).

[495] *J.L. v. Manteca Unified Sch. Dist.*, 2016 U.S. Dist. LEXIS 77441 (E.D. Cal. June 14, 2016); see also *S.J. v. Issaquah Sch. Dist.*, 2007 U.S. Dist. LEXIS 67735 (W.D. Wash. Sept. 12, 2007) (a functional behavior assessment is required only when a student has been removed from her current placement).

[496] WAC 392-172A-01031.

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2023-SE-0130
Docket No. 07-2023-OSPI-01971
8612 - OSPI
Page 85

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

the record showing the Student's behavior in school impeded the Student's learning or that of others. Based on the above, the District did not deny the Student FAPE when it declined to provide the Student with a BIP subsequent to the November 2021 Reevaluation.

81.    The Parent has not met her burden to prove this claim.

**Issue b – Whether Parent's unilateral placement of Student with a privately funded intervener was proper**

82.    Parents who unilaterally enroll a student in a private school are entitled to reimbursement only if: (1) the district placement violated the IDEA; and (2) the Parents' private school placement is "proper" under the IDEA.[497] Once a district fails to develop an IEP that makes FAPE available, the proper private placement need only confer some educational benefit to the student.[498] A private school placement does not need to maximize the student's potential or provide every special education service and support she needs to be deemed proper or "appropriate" for reimbursement purposes.[499] A unilateral private placement is "appropriate" for reimbursement purposes if it offers instruction that is specially designed to meet the student's unique needs as well as the support services the student requires to benefit from that instruction.[500] A private placement does not need to satisfy the IDEA's least-restrictive environment requirement to be proper under the Act.[501]

83.    Here, by May 2022, the Parent believed that the Student required a university-trained intervener, fluent in ASL, who was able to use tactile signing with the Student. The Parent chose to place the Student at St. Nick's in Fall 2022 because St. Nick's would allow her to have the intervener of her choice. However, as is addressed above, there was no legal requirement in Washington for the District to do more than consider the Parent's request for a nationally accredited intervener, which the record shows it did, and no requirement under the IDEA that the District provide an intervener, accredited or not, for the Student. Moreover, the record does not establish that the Student required a nationally accredited intervener to receive FAPE. This tribunal concluded herein that the District did not materially fail to implement the Student's IEP

---

[497] *Florence County Sch. Dist. v. Carter,* 510 U.S. 7, 15, 114 S. Ct. 361 (1993).

[498] *C.B. v. Special Sch. Dist. No. 1* 56 IDELR 187 (8th Cir. 2011); and *Warren G. v. Cumberland County Sch. Dist.* 31 IDELR 27 (3d Cir. 1999).

[499] *See, e.g., C.B. v. Garden Grove Unified Sch. Dist.*, 56 IDELR 21 (9th Cir. 2011), *cert. denied*, 111 LRP 68912, 132 S. Ct. 500 (U.S. 2011).

[500] *M.N. v. State of Hawaii, Dep't of Educ.*, 60 IDELR 181 (9th Cir. 2013, *unpublished*).

[501] *C.B. v. Special Sch. Dist. No. 1*, 636 F.3d 981, 991 (8th Cir. 2011)

when it provided services using paraeducators training as interveners through OHOA modules, rather than interveners with a national certification or other training. The tribunal has found no violation of the IDEA by the District in this case; therefore, the Parent's unilateral placement was not warranted or proper under the IDEA and the District is not responsible for the costs of the Parent's unilateral decision to enroll Student at St. Nick's for the 2022-2023 school year.

84.    The Parent has not met her burden to prove this claim.

## ORDER

The Parent has not established that the District denied the Student a free appropriate public education and, therefore, is not entitled to a remedy.

SERVED on the date of mailing.

Jill H. Brown
Administrative Law Judge
Office of Administrative Hearings

## Right To Bring A Civil Action Under The IDEA

Pursuant to 20 U.S.C. 1415(i)(2), any party aggrieved by this final decision may appeal by filing a civil action in a state superior court or federal district court of the United States. The civil action must be brought within ninety days after the ALJ has mailed the final decision to the parties. The civil action must be filed and served upon all parties of record in the manner prescribed by the applicable local state or federal rules of civil procedure. A copy of the civil action must be provided to OSPI, Legal Services, PO Box 47200, Olympia, WA 98504-7200. To request the administrative record, contact OSPI at appeals@k12.wa.us.

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2023-SE-0130
Docket No. 07-2023-OSPI-01971
8612 - OSPI
Page 87

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

DECLARATION OF SERVICE

I declare under penalty of perjury under the laws of the State of Washington that true copies of this document were served upon the following as indicated:

Ryan Ford                              via E-mail
Cedar Law PLLC                         ryan@cedarlawpllc.com
113 Cherry St.                         emma@cedarlawpllc.com
PMB 96563
Seattle, WA  98104


Parent                                 via E-mail
4108 69th Ave Ct. NW                   katie.wright8@icloud.com
Gig Harbor, WA  98335


Janna Rush                             via E-mail
Lisa Reaugh                            rushj@psd401.net
Peninsula School District              reaughl@psd401.net
14015 62nd Avenue NW
Gig Harbor, WA  98332


Carlos Chavez                          via E-mail
Pacifica Law Group LLP                 carlos.chavez@pacificalawgroup.com
1191 Second Avenue, Suite 2000         grace.mcdonough@pacificalawgroup.com
Seattle, WA  98101


Dated July 2, 2024, at Olympia, Washington.

*Lan Le*
_____
Representative
Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489


cc:      Administrative Resource Services, OSPI